### SPURR v. UNITED STATES.

#### (Circuit Court of Appeals, Sixth Circuit. June 1, 1898.)

#### No. 502.

1. NATIONAL BANKS—OFFICERS—CERTIFICATION OF CHECKS WITHOUT FUNDS—PRESUMPTION OF KNOWLEDGE.

   In a prosecution against a national bank president for unlawfully certifying checks, it is not error to instruct the jury that the presumption is that he had knowledge of the condition of the account upon which the checks were drawn, where the same instruction cautions them that such presumption may be rebutted by evidence that the defendant did not in fact have such knowledge.

2. SAME—WILLFUL FAILURE TO INVESTIGATE.

   In order to convict a national bank officer of wrongfully certifying checks, it is not necessary to show that he had actual knowledge that the account against which the checks were drawn was not sufficient; it is enough if he willfully refrained from investigation, in order to avoid knowledge.

3. EVIDENCE — ADMISSIBILITY — SPECULATION BY BANK OFFICER WITH BANK FUNDS.

   Upon the trial of the president of a national bank for certifying checks without funds, evidence of speculations by the cashier with funds of the bank, with defendant's knowledge, is admissible for its bearing upon the right of the latter to rely upon the former's representations as to the state of the customer's accounts.

4. SAME—TO ESTABLISH INTENT—PERIOD OF TIME COVERED.

   The period of time within which collateral transactions offered to show a guilty intent must have occurred is largely discretionary with the court.

5. SAME—REPUTATION FOR HONESTY.

   Upon the trial of a national bank officer for official misconduct, evidence as to the defendant's reputation for honesty and integrity should be limited to such reputation down to the time of the failure of the bank.

6. SAME—REPUTATION FOR TRUTHFULNESS.

   In general, where no attempt has been made to impeach the defendant's testimony, he may not add to the weight of his evidence by evidence of his general reputation for truthfulness.

## In Error to the Circuit Court of the United States for the Middle District of Tennessee.

Three indictments were found against the defendant, each of which contained several counts, for violation of section 5208 of the Revised Statutes, by which it is provided: "It shall be unlawful for any officer, clerk or agent of any national banking association to certify any check drawn upon the association unless the person or company drawing the check has on deposit with the association, at the time such check is certified, an amount of money equal to the amount specified in such check." By section 13 of the act of congress approved July 12, 1882, it is enacted as follows: "That any officer, clerk or agent or any national banking association who shall willfully violate the provisions of an act entitled 'An act in reference to certifying checks by

national banks,' approved March 3, 1869, being section 5208 of the Revised Statutes of the United States, or who shall resort to any device or receive any fictitious obligation, direct or collateral, in order to avoid the provisions thereof, or who shall certify checks before the amount thereof shall have been regularly entered to the credit of the dealer upon the books of the banking association, shall be deemed guilty of a misdemeanor and shall, on conviction thereof in any circuit or district court of the United States, be fined not more than five thousand dollars, or shall be imprisoned not more than five years, or both, in the discretion of the court." The three indictments found against the defendant were consolidated and tried together. The several counts of the indictments mutatis mutandis charge that "he, the said Marcus A. Spurr, being then an officer, to wit, the president of said the Commercial National Bank, did willfully violate the provisions of section 5208, United States Revised Statutes, and did, without the consent of the bank, its board of directors and committees, willfully, unlawfully, and knowingly certify a check drawn upon said the Commercial National Bank by said company, to wit, the said Dobbins & Dazey, they, the said Dobbins & Dazey, as he, the said Marcus A. Spurr, well knew, not having at said time on deposit with the said the Commercial National Bank an amount of money equal to the amount specified in said check," etc. The several counts of the consolidated indictments charged the certification by defendant of four checks drawn by Dobbins & Dazey, between December 9, 1892, and February 13, 1893, both inclusive, on the Commercial National Bank of Nashville, Tennessee, aggregating $95,641.95. The total amount of checks of Dobbins & Dazey certified by defendant between said dates was $110,366.54.

The Commercial National Bank was organized in 1884. Defendant was president, and F. Porterfield was cashier, from its organization to its failure, March 25, 1893. The original capital stock of the bank was $200,000, which was increased from time to time to $500,000. The firm of Dobbins & Dazey was engaged in the purchase, sale, and exportation of cotton. Its financial standing and credit was excellent, but its assets consisted only of money, choses in action, and cotton on hand and in transit. On December 9, 1892, at the close of business, the individual ledger of the bank showed that Dobbins & Dazey's account was overdrawn in the sum of $64,417.97, and on that date the defendant certified that firm's check for $15,000. At the close of business December 17, 1892, Dobbins & Dazey's account was overdrawn in the sum of $51,070.65; and on that day their check for $31,000 was certified by defendant. At the close of business January 2, 1893, Dobbins & Dazey's account was overdrawn $77,515.59, and, at the close of business the next day, $38,125.84, on which day defendant certified their check for $40,000. At the close of business February 11, 1893, Dobbins & Dazey had overdrawn their account $49,454.59 (February 12th was a holiday); and at the close of business February 13, 1893, their account was overdrawn $68,243.73. On that day defendant certified their check for $9,641.95. The evidence on the part of the government tended to show that the account of Dobbins & Dazey was continuously and largely overdrawn upon the individual ledger during the period covered by the checks certified by defendant (except one day in January, 1893, when there was a small credit balance), and that this fact was known to Porterfield, the cashier, and all the employés of the bank under him in authority. The board of directors of the bank consisted of 21 members. It had two standing committees, known as the "Executive Committee" (of which defendant was a member), whose duties were prescribed by by-law 17, and an "Examining Committee," with the powers and duties prescribed by by-law 28. By-law 17 empowered the executive committee to discount and purchase bills, notes, and other evidences of debt, and to buy and sell bills of exchange, and required them to report at each regular meeting of the board of directors all bills, notes, and other evidences of debt purchased by them since their last regular report. By-law 28 made it the duty of the examining committee to examine, four times a year or oftener, the affairs of the bank, count its cash, compare the assets with the accounts of the general ledger, and ascertain if these and all other accounts were correctly kept, and whether the bank's condition corresponded therewith, and whether the bank was in a sound and solvent condition, etc., and report the result of their ex-

amination at the next regular meeting of the board. Under by-law 8, the cashier was primarily responsible for all funds, property, and valuables of the bank. Under by-law 9, the president was responsible only for such funds, property, and valuables of the bank which should come into his hands as president. Both officers were required under these by-laws, respectively, to give security for the faithful and honest discharge of their respective duties. By-law 19 provided: "That no officer or clerk of this bank shall pay any check drawn upon it or pay out money on any order unless the drawer of such check or order shall, at the time of the presentation thereof, have deposited in the bank sufficient funds to meet such check or order."

There was evidence tending to show that defendant had access to the books of the bank, and that he frequently made inquiries of the clerks and bookkeepers concerning various matters and accounts. The only direct testimony that defendant was informed of the state of that account at the dates of the certifications was that of Porterfield, the cashier, who testified that between November 25, 1892, and the failure of the bank, March 25, 1893, he apprised defendant that Dobbins & Dazey's account was continuously and largely overdrawn. Evidence was also received, as indicating defendant's knowledge of the state of Dobbins & Dazey's account, that defendant and Porterfield, the cashier, were each engaged in speculation in cotton futures, through Dobbins & Dazey, during the period covered by the dates of the checks certified by defendant, and that Porterfield was so engaged without furnishing any margins, and that the funds of the bank were used by Dobbins & Dazey in such speculations without the knowledge of defendant. The evidence upon these points was conflicting. Defendant was also sworn as a witness in his own behalf.

For the purpose of establishing defendant's knowledge and intent, evidence was admitted to show that, in 1886 and 1887, Porterfield, with defendant's knowledge, but without the consent or knowledge of the bank, its directors or committee, used a large amount of the funds and moneys of the bank in the purchase on speculation of stocks for the joint account of himself and defendant and other persons in the name of the bank or in his (Porterfield's) name as cashier. For the same purpose, evidence was also admitted bearing on two other accounts, one opened March 12, 1889, with Herzfeld & Co., New York City, in the name of "Frank Porterfield," separate, and the other opened October 3, 1889, with Latham, Alexander & Co., of New York City, in the name of "Porterfield & Spurr," both of which were continued down to the close of the bank, in 1893, and that the defendant and Porterfield were jointly interested in the speculations indicated by those accounts during the entire period of their existence; that numerous purchases and sales of stocks, bonds, and other funds were made by them for their joint benefit on those accounts; and that large sums of the moneys and funds of the bank were used by Porterfield without securing or reimbursing the bank in such purchases, with the knowledge and consent of defendant after the accounts had been running some time (not when they were opened). There was also evidence that defendant and another director objected to opening an account with Dobbins & Dazey, on the ground that their business was understood to be large, and would require the bank to provide cash to meet the checks of the firm on Eastern drafts, secured by bills of lading, for cotton, and the bank might not always be able to provide sufficient funds to carry the account; that Dudley, the director who shared Spurr's objections to receiving the account, had been in the cotton business, and stated at the directors' meeting that Dobbins & Dazey would be likely to overdraw their account; that, when the account was accepted, the cashier was instructed by the committee, in defendant's presence, not to allow Dobbins & Dazey to overdraw their account, nor to borrow more than their line of credit, which was $30,000, and not to discount their drafts without bills of lading attached, and the cashier promised obedience to the order, and reported to Dudley several times that the account was profitable and satisfactory; that the committee understood and believed that the cashier was obeying his instructions; that the members of both committees and the directors had no information, before March 25, 1893, that Dobbins & Dazey's account was overdrawn, or that they were depositing and discounting, or had deposited or discounted, Eastern drafts,

without bills of lading attached; that the directors and committee did not regard it as their duty to examine depositor's ledger accounts or the drafts deposited by them; that, prior to and during the period covered by the dates of the checks certified by defendant, Dazey, one of the firm of Dobbins & Dazey, was conducting a system of what is known among bankers as "kiting" between Nashville and New York,—that is, he would draw in the firm name large drafts on John Monroe & Co. and Latham, Alexander & Co., bankers and brokers, the New York correspondents of Dobbins & Dazey, and deposit and discount such drafts without bills of lading attached, and take credit for the proceeds as cash on the account of Dobbins & Dazey in one or the other of the two banks of Nashville in which they carried regular accounts, viz. the Commercial National Bank or the First National Bank. Dazey would then draw in his firm's name checks on one of these banks, generally in favor of the Fourth National Bank of Nashville, but sometimes on another bank. These checks were then certified by the Commercial National Bank or the First National Bank, whereupon the Fourth National or the American National Bank would transmit to New York, by wire, the money to meet Dobbins & Dazey's drafts maturing in New York, and the latter banks would collect the amount of the checks from the Commercial National or the First National Bank, as the case might be. Dazey would then draw another set of drafts in Dobbins & Dazey's name, without bills of lading attached, on the same drawees in New York, and take credit for their proceeds as cash in the Commercial National or First National Bank. He would then draw a second set of checks on the Commercial National Bank or the First National Bank, in favor of the Fourth National Bank or the American National Bank, and these would be certified by the Commercial or the First National Bank. The Fourth National Bank or the American National Bank would transmit the necessary amount by wire to New York to meet the second set of drafts, and would again reimburse themselves by collecting the several sets of checks from the certifying banks. When these drafts were drawn by Dazey, his firm was largely overdrawn with the drawees. This process was repeated again and again for nearly six months preceding the failure of the Commercial National Bank, during which time said bank received and entered as cash Dobbins & Dazey's drafts for $1,829,427.25, which had no bills of lading attached; and at the bank's failure, March 28, 1893, it had on hand Dobbins & Dazey's drafts of this kind to the amount of $142,000, which had been discounted and credited to the drawers by the Commercial National Bank, February 27, 1893.

The jury found the defendant guilty upon certain counts of the consolidated indictments. Motions in arrest of judgment and for a new trial were overruled, and the defendant was sentenced to be imprisoned for two years and six months upon three counts of the consolidated indictments, based on the checks certified by the defendant, January 3, 1893. To reverse this judgment, the defendant brought this writ of error.

John A. Pitts and B. P. Waggener, for plaintiff in error.

Ed. Baxter, for defendant in error.

Before BARR, RICKS, and SWAN, District Judges.

SWAN, District Judge (after stating the facts). The errors assigned and relied upon are 19 in number. Some of these present questions dependent upon the same principles as others, and will not be separately discussed.

The first assignment is predicated upon the following excerpt from the charge of the court, viz.:

"It was the defendant's duty, before certifying the checks, if he was not informed, to inform himself of the state of the account on which they were drawn. From the existence of such a duty you may draw an inference of fact that he did so inform himself, if he did not already know it. But the presumption of knowledge is not an absolute one, and the defendant may show, if he can, that he did not in fact acquire information of the truth."

In the next sentence of the charge, the jury were instructed:

"And, in general, if the defendant acted in good faith in making these certifications, believing that the state of the account of Dobbins & Dazey justified it, he was not guilty of the offense charged. Mere negligence or carelessness, unaccompanied by bad faith, would not render him guilty."

The learned judge had previously instructed the jury that the checks had become the obligations of the Commercial National Bank solely by defendant's certification. The facts of certification by defendant, as president, and that Dobbins & Dazey had no funds in the bank at the times of the certifications, were admitted. The only question of fact, therefore, left for determination, it is admitted, were the defendant's knowledge of the state of Dobbins & Dazey's account when the checks were certified; and his purpose or intent in the certifications. The instruction criticised did not inform the jury that the effect of the legal presumption was to shift the burden of proof to defendant to negative the inference of fact, but was permissive merely, and left the jury free to determine, upon all the evidence in the case, whether, notwithstanding the inference derivable from the existence of the duty, the defendant had that knowledge of the account which the court, elsewhere in its charge, made a necessary element of the offense. Defendant's legal duty, as an officer of the bank, to be informed, was prima facie evidence of his performance of that duty. Insurance Co. v. Pendleton, 115 U. S. 339, 347, 6 Sup. Ct. 74; Finn v. Brown, 142 U. S. 71, 12 Sup. Ct. 136. This was all the effect given it by the instruction in question. The case of Agnew v. U. S., 165 U. S. 36, 49, 17 Sup. Ct. 235, approved an instruction that an inference or presumption of an unlawful intent throws the burden of proof on defendant.

There was other evidence, direct and circumstantial, tending to show that defendant knew or had reason to believe, at the times of certification of the checks, that the account of Dobbins & Dazey was largely overdrawn. The case therefore was not committed to the jury solely upon the inference predicated upon defendant's official position that he had discharged the duty it devolved upon him before the acts of certification; but the jury were explicitly instructed that the government must establish the defendant's knowledge of the state of the Dobbins & Dazey account beyond a reasonable doubt, in order to maintain any of the counts in the indictment. Nor did the last sentence of the charge covered by this assignment put upon defendant the disproof of knowledge of the account in question. Referring to the inference of knowledge, the court added:

"But the presumption of knowledge is not an absolute one, and the defendant may show, if he can, that he did not, in fact, acquire information of the truth."

This certainly deprived that presumption of any controlling influence, in the minds of the jury, against the defendant, and emphasized its rebuttable nature. But even if a hypercritical construction, adverse to the defendant, could be extracted from this passage of the charge standing by itself, it is manifest that its connection with other parts of the charge clearly negatives any argument based upon this isolated sentence.

2. The modification of defendant's third, and the refusal of his seventh, request for instructions, were justified by the fact that both were pervaded by the common error that they singled out particular circumstances, omitted all reference to others of importance, and sought to confine the jury to the matters narrated, thus excluding other evidence which the jury might have deemed important. Both were calculated to mislead the jury, and were argumentative. Railway Co. v. Ives, 144 U. S. 433, 12 Sup. Ct. 679; Railway Co. v. Leak, 163 U. S. 280, 16 Sup. Ct. 1020; Agnew v. U. S., 165 U. S. 51, 17 Sup. Ct. 235; Catts v. Phalen, 2 How. 382.

3. The fourth request of defendant was properly refused. It not only prayed for an instruction on the weight of conflicting evidence, but also for a direction to the jury to disregard presumptive proof on the assumption that it was rebutted by other matters of fact. It was no part of the duty of the court to decide upon the relative force of the facts. Crane v. Morris, 6 Pet. 598, 616, 617; Lilienthel's Tobacco Co. v. U. S., 97 U. S. 237, 268; Kelly v. Jackson, 6 Pet. 622.

4. The refusals of the defendant's sixth and ninth requests were also proper. Both were fully covered by the charge given. The court instructed the jury:

"The government is bound, in order to maintain any of the counts in, the indictment, to prove * * * (3) that the defendant knew that there were no funds of the drawer in the bank sufficient to meet them [the checks]."

Again: "You must be satisfied from the proof, beyond a reasonable doubt, of every fact essential to the guilt of the defendant, of the specific charges contained in the indictment, before you will be warranted in convicting him. * * * The facts which are charged as constituting guilt must be so proven as to persuade a clear and abiding conviction of defendant's guilt,—such conviction as is not shaken by any reasonable doubt grounded upon the testimony. If you are so convinced of his guilt, he should be convicted; otherwise, not."

The remainder of the sixth request was also fully covered by the following passages in the charge:

"Knowledge of the defendant of the state of Dobbins & Dazey's account, when he certified the checks, is thus made the pivotal question in the case. Upon this question of knowledge, the court charges you that it is not necessary for the government to show that the defendant knew of the lack of funds of Dobbins & Dazey, from an actual examination of the books of the bank or from any inquiries made at that time. If the defendant knew that he had good reason for believing Dobbins & Dazey's account to be overdrawn, and refrained from making such inquiry for the reason that he knew of the condition of the account, or because he was purposed to certify the check without reference to whether there were funds sufficient to meet it or not, that is sufficient; that is to say, if he shut his eyes to what he believed was the fact, and kept himself in ignorance of the state of the account because he believed an examination would disclose the facts, this would be equivalent to express knowledge. Nor is it necessary to prove that the defendant knew just what was the extent of the overdraft on Dobbins & Dazey's account, or of the lack of funds to meet the checks. If he knew of the substance of the fact that Dobbins & Dazey had not funds to meet their checks, and that there was no warrant for marking the checks good, that was sufficient."

This correctly states the law. The government was not bound to show defendant "actually knew" that Dobbins & Dazey had no funds in the bank. The judge further said:

"And, in general, if the defendant acted in good faith in making these certifications, believing that the state of the account of Dobbins & Dazey justified it, he is not guilty of the offense charged. Mere negligence or carelessness, unaccompanied by bad faith; would not render him guilty."

Again: "If the proof fails to satisfy your minds clearly and beyond a reasonable doubt that the defendant did actually know, at the time he certified the checks mentioned in the indictment, that Dobbins & Dazey did not have on deposit in the bank sufficient funds and credits to meet the checks so certified, then you should acquit him, unless you are convinced by the proof beyond a reasonable doubt that he willfully, designedly, and in bad faith— these words mean substantially the same thing—shut his eyes to the facts and purposely refrained from inquiry and investigation for the purpose of avoiding knowledge."

5. The modification of defendant's second request affords no just cause of complaint. The request recited the respective duties of the president and cashier of the bank as apportioned under by-laws 8 and 9, and the jury were instructed, as prayed:

"These two by-laws taken together mean and imply that the cashier is primarily responsible for all the funds, property, and valuables of the bank, and that the president is responsible only for such funds, property, and valuables of the bank that may be placed in his hands as president, and that both of these officers are each to faithfully and honestly discharge their respective duties."

The court then added:

"But I further charge you that the president is a general officer of the bank, and it is admitted that he had authority, notwithstanding these by-laws, * * * to certify checks; and, when the president assumes to certify these checks as good, the faithful and honest discharge of his duties required him to be informed of the condition of the account on which they were drawn."

Without this modification, the instruction prayed would have been misleading, and would have given the jury to understand that by-laws 8 and 9 alone were the measure of defendant's official duty in dealing with the funds of the bank by certification of checks, and that under those the primary responsibility of the cashier for such funds and property would relieve the defendant, as president, from civil and criminal responsibility, under section 5208, Rev. St. U. S., and section 13 of the act of July 12, 1882. These statutes, by necessary implication, impose upon the certifying officer the duty of knowledge of the state of the account before certification of checks drawn upon it. This duty could not be abrogated by by-laws of the bank, or any division of duties between its officers. Nor was it the purpose of these by-laws to exempt the president, when he assumed to certify checks, from the statutory duty of knowledge. This is evident from the bank's by-law No. 19, which provided that:

"No officer or clerk of this bank shall pay any check drawn upon it or pay out money on any order unless the drawer of such check or order shall, at the time of the presentation thereof, have deposited in the bank funds sufficient to meet such check or order."

By-laws 8 and 9 were, perhaps, properly called to the attention of the jury for their bearing upon the question of the intent with which defendant acted in the certifications. Potter v. U. S., 155 U. S. 447, 15 Sup. Ct. 144. There is no substantial difference between the requirements of these by-laws and the duties imposed by the statute and defendant's official oath required by section 5147, Rev. St. U. S.

The defendant certainly could not complain that the adoption from the language of the request of the phrase "faithful and honest discharge of his duties" by the court was an expression of opinion on the facts. If it were, it would not have been an error, as the facts were left to the decision of the jury. Simmons v. U. S., 142 U. S. 148, 12 Sup. Ct. 171; Allis v. U..S., 155 U. S. 123, 15 Sup. Ct. 36.

6. The court instructed the jury:

"The government is bound, in order to maintain any of the counts in this indictment, to prove (1) that the defendant certified the check; (2) that the drawers of the check had not sufficient funds in the bank to meet such check; (3) that the defendant knew that there were no funds of the drawer in the bank sufficient to meet them. This last element of the offense charged will be explained, and its modification stated further on."

It is argued that the jury were thus informed that the establishment of these three facts—the first two of which were conceded—would authorize conviction. This would be true if the instruction had been submitted as complete in itself upon the essentials of the crime, and as dispensing with the necessity of proof of the intent which accompanied the act of certification; but the last paragraph clearly excluded that view of its design and scope. Its promise was fulfilled in the passages in the charge quoted in our review of the sixth request. These, in connection with the extract criticised, defined fairly the essentials of the offense and the degree of proof required upon the questions of knowledge and intent. The court was not bound to adopt the language of the request. Railroad Co. v. Horst, 93 U. S. 295; Tucker v. U. S., 151 U. S. 164, 170, 14 Sup. Ct. 299.

Assignments 7 and 9: The seventh and ninth assignments are based upon defendant's fifth, and part of defendant's seventh, request for instruction. The former was, in substance, that if the jury found that the account of Dobbins & Dazey, upon the books of the bank, was overdrawn continuously during the period covered by the checks certified, and that the defendant certified the checks in ignorance of such overdraft, "believing at the time that the exchange deposited by Dobbins & Dazey, on the days on which such checks were certified, was sufficient to cover the amount of such checks [besides the overdraft then existing], then he is not guilty, and you should acquit him unless such ignorance was willful, as elsewhere explained in the court's instructions." The modification criticised consisted in adding the words inclosed in brackets. The subject had been fully treated in the charge, and the request should have been refused. Without the modification, it is clear that the instruction prayed would, if granted, have given the jury to understand that it was not necessary for defendant to have ascertained the state of the Dobbins & Dazey account before certifying the check, but it would be sufficient per se to acquit him if he believed that the amount of the exchange deposited—inclusive, necessarily, of the "kiting" and other drafts made by that firm upon overdrawn accounts without bills of lading attached—equaled the checks certified. This would have been in direct conflict with that part of the charge presented by the first assignment, which we have approved, and would have nullified the

statute which prohibits certification of checks "before the amount thereof shall have been regularly entered to the credit of the drawer upon the books of the banking association." The purpose of the modification was to preclude such a misconception of the defendant's duty, and to bring the request into harmony with the statute and the general charge definitive of that duty. The only lawful basis for certification is that prescribed by the statute, and the utmost effect that can be ascribed to the instruction as amended was that it required the defendant to act upon the state of the account, not merely upon his belief in the amount of the exchange deposited, leaving the jury free, however, under the general charge, to determine the intent with which the defendant acted. The pith of the instruction, as thus modified, was so fully covered by the extracts from the charge given in the examination of the first, fourth, and tenth assignments of error as to leave the defendant no ground of complaint against the amendment.

The court adopted part of defendant's seventh request, after modifying it so that it read:

"If you find that in each instance, when he certified a check, the defendant had information from the cashier or exchange clerk upon which he relied in good faith, that a sufficient amount had been deposited that day, and was in the bank to cover the checks certified [I add, in addition to the existing overdraft], he would not be guilty under the indictment, and you should acquit him."

The qualification of this request complained of is contained in the words in brackets. The reasons stated in the consideration of the seventh assignment of error approve the action of the court in making the same addition to this part of the charge.

Assignment 11: The eleventh assignment of error has nothing to sustain it. The jury returned into court after receiving the charge, and asked the following question: "We want the law as to the certification of checks when no money appeared to the credit of the drawer." The court, in response, read the first paragraph of section 5208 of the United States Revised Statutes, and asked the jury if that answered their question. The foreman responded, "Yes." The court then read said paragraph a second time, remarking, "I read it again, that you may all understand it." This action was excepted to, on the ground that the court failed to read and explain section 13 of the act of July 12, 1882, imposing the penalty for the willful false certification of checks. The argument in support of this exception assumes that "what the jury wanted to know was the law applicable to this case, * * * the law applicable to the criminal false certification,"—and therefore the court should have read section 13 of the act of July 12, 1882. It is also urged that the court gave the jury to understand that the certification of a check, when there were no funds in bank to meet it, was sufficient to sustain the indictment. The assumption is negatived by the answer of the jury. The court charged that, to warrant conviction, the certification must have been willfully made, not merely false in fact. That distinction was emphasized in the following extract from the charge:

"The question remains for you to settle upon all the evidence whether the defendant, Spurr, in certifying these checks, acted in good faith, and without any intent to do that which the law forbids, and which he must be presumed to know was unlawful, namely, the certifying of a check as good when the maker of it had no funds in the bank to meet it. If he acted in good faith, believing that the makers of the checks had funds in the bank to pay them, he should be acquitted. If he certified the checks either knowing that the funds to respond were not in the bank, and that the making of the check was unwarranted, or, having in his conscience good reason for believing that such was the fact, purposely refrained from inquiry, then the charge against him is made out. The facts which are charged as constituting his guilt must be proven beyond a reasonable doubt."

This was a full and fair exposition of the disputed elements of the offense charged. Other parts of the charge were equally explicit to the same effect, as we have shown elsewhere.

Assignment 12: Error is assigned on the admission of evidence of the stock transactions had through the bank or Porterfield, as cashier, in 1886 and 1887. This was received "for its bearing upon the right of Spurr to rely upon Porterfield's representations upon the question of fact,—whether he did rely upon any assumed correctness or honesty of action." Upon this question the government offered evidence of purchases and sales of stock on the New York Exchange, through certain brokers and dealers in stocks in New York in the name of Porterfield, cashier of the Commercial National Bank, for the account of sundry customers of said bank, as well as Porterfield, R. S. Cowen, assistant cashier of said bank, and defendant. These purchases and sales were made with funds of the bank remitted to New York by Porterfield, and embraced transactions from February 18, 1886, to January 15, 1887, both inclusive. The amount of the bank's money remitted by Porterfield to be used as margins in these transactions was over $66,000. The profits accruing to defendant from these ventures were credited to him on the books of the Commercial National Bank at the times of the sales, and afterwards were credited on his pass book, and drawn out by him. There was also evidence that defendant accounted for the exact amount of losses shown upon the accounts, statements, tickets, slips, and memoranda made out by Porterfield in reference to said transactions, and gave his notes to the bank with collateral security for his share of the losses; but defendant never informed the executive committee of the bank or its directors that these notes were given to cover losses on stock speculations. There was evidence that the funds of the bank were thus used by the cashier with defendant's knowledge, but without that of the directors or committees of the bank. The evidence relied upon to show defendant's intent in certification of Dobbins & Dazey's checks was largely circumstantial. In such cases, a broad range of inquiry is permitted, and when the evidence tends even remotely to establish the ultimate fact, its admission will not be ground for reversal. Clune v. U. S., 159 U. S. 593, 16 Sup. Ct. 125; Alexander v. U. S., 138 U. S. 353, 11 Sup. Ct. 350. Evidence of similar transactions to illustrate the character of the act in question has repeatedly been held competent in both criminal and civil cases, and is often the only method of establishing the intent with which they were done. Allis v. U. S., 155 U. S. 119,

15 Sup. Ct. 36; Wood v. U. S., 16 Pet. 342; U. S. v. Wood, 14 Pet. 230; Taylor v. U. S., 3 How. 197–208; Mining Co. v. Watrous, 9 C. C. A. 415, 61 Fed. 163–179.

The objection that the collateral transactions were too remote is not tenable. It goes only to the weight of the testimony. The period of time within which the matter offered to establish the guilty purpose must have occurred to permit of their admission is largely discretionary with the court. Moore v. U. S., 150 U. S. 60, 14 Sup. Ct. 26. In U. S. v. Thirty-Six Barrels of High Wines, 12 Int. Rev. Rec. 40, 41, Judge Woodruff said that, for the purpose of showing the quo animo of an act under inquiry, he would not hesitate to admit evidence of acts running back to the enactment of the internal revenue law, which had then been passed fully five years. Similar evidence was received in Coffin v. U. S., 162 U. S. 664, 16 Sup. Ct. 943, for the same purpose. It is every-day practice to admit proof of this character to show intent on the trial of persons charged with counterfeiting. The evidence was properly received, and its purpose carefully defined and limited, in the charge of the court, in accordance with the case last cited.

Assignments 13 and 14: The instruction which is the subject of this assignment and the refusal of defendant's thirteenth request may be considered together. The first declared and the second conceded the illegality of speculation by a national bank or its officers in stocks and bonds upon margins. This was correct. First Nat. Bank v. National Exchange Bank, 92 U. S. 128; Bank v. Kennedy, 167 U. S. 362, 367, 17 Sup. Ct. 831. The court then told the jury that if Porterfield, with Spurr's knowledge, was engaged in misusing the bank's funds and credits on cotton and stock exchanges in his own or the interest of others, "the jury were at liberty to find in that a reason why Mr. Spurr should not have confidence in Porterfield's integrity and fidelity to the interests of the bank, and why Mr. Spurr would, in the exercise of his own duties, have exercised a closer scrutiny of the dealings of Dobbins & Dazey with the bank, especially if he had reason to suppose that firm was engaged in such speculations." We perceive nothing erroneous in this. Preston v. Prather, 137 U. S. 605, 11 Sup. Ct. 162. The request refused would, if granted, have practically directed the jury that the confessedly illegal practices of the national banks of the city in receiving and executing orders for the purchase and sale of stocks and bonds on margins, if profitable, the receipt by stockholders of profits therefrom, and the opinions of individuals engaged in like speculations, provided defendant had no reason to suspect the cashier of dishonesty in the conduct of such transactions, and secured the bank against loss from the execution of his orders for such prohibited purchases and sales, could not and ought not to be given any weight against defendant, although the Commercial National Bank did such business. This proposition is entirely untenable, and is irreconcilable with the admission in evidence of those transactions which we have just approved. The evidence of the manner in which the defendant dealt or permitted others to deal with the funds of the bank having been

properly admitted, its weight and effect was a question for the jury, and not one of law for the court.

Assignment 15: The modification of defendant's tenth request was necessary to prevent the misleading of the jury. The court, at defendant's request, had told the jury, in substance, that, if defendant certified the checks in good faith and honest reliance on the cashier's statement as to the Dobbins & Dazey account, his certifications would not be criminal. This followed immediately the clause modified, which read as presented: "And if the cashier was reputed to be, and believed by the defendant to be, a man of honesty and truth, the defendant would have a right to rely upon his statements in regard to that account [Dobbins & Dazey's]." The court struck out the word "truth," and substituted therefor the words "right conduct as respects the affairs of the bank," and with this amendment granted the request. Whether or not defendant had a right to rely or in fact relied in good faith upon Porterfield's statements in reference to that account was a question of fact to be determined, not alone by the cashier's reputation or by defendant's professed belief in his general truthfulness, but from all facts and circumstances known to defendant tending to approve or discredit the bona fides of his confidence in Porterfield's official conduct. Defendant was not prejudiced by this amendment, especially as the general charge covered the subject fully.

Assignment 16: The eleventh request, to the effect that unless defendant knew or had reason to believe that the cashier "was despoiling the bank, and using its funds instead of his own," in his dealings in stocks and bonds and cotton futures, the fact that defendant knew that the cashier had dealt in those commodities "would not deprive the defendant of the right to rely on his statements in respect to the affairs of the bank," was substantially granted, after substituting for the phrase "so despoiling the bank and using its funds" the words "had been using the funds or credits of the bank." There is no merit in the objection made to this change. It is mere verbal criticism. The substitution of the words "unlawfully in respect to its affairs," in place of the word "dishonestly," in the last paragraph of the request,—making it read, "In order to deprive the defendant of the right to rely upon the cashier, it must be shown beyond a reasonable doubt that he knew the cashier was unfaithful to the bank, and acted unlawfully in respect to its affairs,"—fully preserved the rights of defendant, and was an impartial reference to all the evidence of defendant's knowledge of the cashier's transactions. The amendment was a synonym, in substance, of the adverb it displaced. The cashier could not have acted "dishonestly" without acting "unlawfully" in respect to the bank's affairs. This request was also so fully covered by defendant's twelfth request, which was granted, that it might correctly have been refused in toto.

Assignment 17: There is nothing in this assignment by which the accounts whose admission is alleged is error can be identified. They are mentioned as "said accounts," without further description. If we assume the reference to be made to the accounts of Herzfeld &

Co. with "Frank Porterfield, Separate," and that of Latham, Alexander & Co. with Porterfield and Spurr,—and this is the theory of counsel for plaintiff in error,—they were plainly competent, under the same rule of evidence which sanctions the admissibility of the transactions had with Kohn, Pepper & Co., De Neufville & Co., and Latham, Alexander & Co., discussed in the examination of defendant's twelfth assignment.

Assignment 18: Defendant's fourteenth request was rightly denied, because fully covered by the instruction given in response to defendant's twelfth request.

Assignment 19: The questions arising under this assignment are presented as if it involved the right of a defendant in a criminal case to give in evidence his character for truth and veracity. It complains of "the exclusion of the evidence of John Overton and other witnesses offered by defendant—First, as to defendant's good character for truth and veracity; and, secondly, as to defendant's good character for honesty and integrity during the whole period of his residence in Nashville." After defendant had testified, his counsel claimed that his testimony had been impeached by the cross-examination, and offered testimony to his good character for truth and veracity and honesty and integrity during the entire period of his residence in Nashville, down to the time of the trial. The court limited the inquiry into defendant's general character to the time of the failure of the bank, reserving for further consideration his right to adduce evidence of his character for truth and veracity. To this ruling the defendant duly excepted. The government "admitted defendant's good character for honesty and integrity down to the period of the charge"; whereupon the court restricted defendant to 10 witnesses upon that point, and that number was examined under the above limitation as to time. The correctness of that limitation is the first inquiry. The reasons assigned by the learned judge for restricting the evidence of defendant's reputation for honesty and integrity to the time of the bank's failure meet our approval. He said:

"If we were to bring the time down to the present, it would be liable to embarrass the jury, and turn their minds from the real merits of the case, and put before them opinions which ought to be kept as far from the jury as possible. * * * We would proceed to launch ourselves upon an inquiry as to what the people of the community thought of the case at present. * * *"

The authorities support this ruling. State v. Marks (Utah) 51 Pac. 1090; State v. Kinley, 43 Iowa, 296; Wroe v. State, 20 Ohio St. 460, 472; White v. State, 111 Ala. 92, 21 South. 330.

The question raised by the second branch of this assignment was rightly decided. The ground on which the offer of evidence as to defendant's character for truth and veracity was based and is here urged was "that defendant had been attacked as a witness, and his testimony impeached by the substance and manner of his cross-examination by counsel for the plaintiff, which had shown a purpose to argue to the jury that he had not testified honestly and conscientiously, but had testified falsely." No testimony was introduced by the government attacking defendant's character for truth and veracity, nor was any evidence offered in rebuttal by the government.

A careful reading of defendant's cross-examination fails to disclose any ground for the admission of evidence of his general reputation for truth and veracity. The fact that contradictions exist between his testimony and that of other witnesses affords no ground for its admission. 1 Greenl. Ev. § 469. In his character as a witness, defendant is not entitled to any privilege not extended to other witnesses. Reagan v. U. S., 157 U. S. 301, 305, 15 Sup. Ct. 610; U. S. v. Hollis, 43 Fed. 248. In general, where no attempt has been made to impeach him by evidence of bad character, or of contradictory statements, or by the cross-examination, he cannot corroborate his testimony or give it weight by evidence of his general reputation for truthfulness; nor will his own view of the effect of his cross-examination make such testimony competent. The rule as to the admissibility of evidence of character is thus broadly stated by Greenleaf (1 Greenl. Ev. § 54):

"And, in all cases where evidence is admitted touching the general character of the party, it ought manifestly to bear reference to the nature of the charge against him."

The evidence offered was obviously intended to give weight to the defendant's personal testimony, not for the purpose of establishing a general character inconsistent with the offense charged. The weight of reasoning and authority justified its exclusion. Stevenson v. Gunning, 64 Vt. 609, 25 Atl. 697; Funderberg v. State, 100 Ala. 36, 37, 14 South. 877; Tedens v. Schumers, 112 Ill. 266, 267; People v. Cowgill, 93 Cal. 597, 29 Pac. 228.

A careful examination of the record satisfies us that the defendant has had a fair trial, and that, both in the rulings upon evidence and in the submission of the case to the jury, his rights were carefully protected. The judgment of the circuit court for the Middle district of Tennessee is therefore affirmed.