No. 15,749.

PEOPLE EX REL. KENT *v.* DENIOUS.

(196 P. [2d] 257)

Decided June 28, 1948.

Messrs. Ireland & Ireland, Mr. C. D. Bromley, for petitioner.

Mr. Ralph L. Carr, Mr. Kenneth W. Robinson, Mr. Hudson Moore, for respondent.

Mr. H. Lawrence Hinkley, Attorney General, Mr.

DUKE W. DUNBAR, Deputy, Mr. JAMES D. GEISSINGER, Assistant, appointed by the court.

*En Banc.*

MR. JUSTICE STONE delivered the opinion of the court.

LoRAINE GOOD KENT as petitioner filed in this court complaint charging unprofessional conduct on the part of respondent Denious in connection with his services as attorney and trustee, and prayed for his disbarment. The matter was referred for hearing to the Honorable H. E. Munson, district judge of the thirteenth judicial district, and upon his death, it was reassigned to the Honorable John M. Meikle, district judge of the fourth judicial district, with instructions to conduct a full hearing and make report of his findings to this court. Hearing of the issues required some seventeen days of testimony and consideration of voluminous records, and thereafter the referee made full and careful analysis of the evidence with report thereof to this court, finding all the issues in favor of respondent. Thereto petitioner filed objections, supported by briefs and oral argument, and these are now before us for consideration. No abstract of the testimony has been presented so it has been necessary to study the entire record without that assistance. A comprehensive review of the 1200 pages of testimony and many exhibits received in the proceeding would serve no purpose. Consequently, we shall make only brief summary.

This proceeding arose out of a long continued relationship of respondent as attorney and business adviser to petitioner and her predecessors. Upon the admission of respondent Denious to the bar in 1902, among the clients of the office where he was employed who came to him for advice, was John Good, a successful brewer of Denver. Good subsequently united his business with that of one Burghardt under the name of the Tivoli-Union

Brewery and the operating, sales, and investment activities of the company were later handled through three corporations—the Tivoli Union Company, the Western Products Company, and the Fortuna Company, together herein referred to as the Tivoli companies. Good owned approximately seven-eighths interest in these companies and Burghardt the balance. Until Good's death in 1918, he was in almost daily contact with respondent concerning legal or business matters. Thereafter Burghardt took control of the operation of the brewery, and Good's son, John E. Good, became active trustee of his father's estate and president of the Tivoli companies. Respondent continued as adviser, attorney, and close friend of John E. Good until the death of the latter in 1931, when respondent became successor trustee of his estate, and his elderly widow and petitioner, who had married John E. Good in 1927, became holders of the beneficial interest therein. Burghardt's activities decreased because of age, until his retirement about 1935. Upon the death of the senior Mrs. Good in 1936, petitioner, who thereupon became the sole owner of both the John Good and John E. Good estates, took up her residence in Florida and New York, paid only brief and infrequent visits to Denver, and turned over to respondent the entire burden of management of the brewery, and the investment of the estates which she had inherited.

Title to properties belonging to the estates, other than those of the Tivoli companies, was placed in the name of the Erie Investment Company, a corporation of which petitioner owned and held the entire capital stock, except for shares which were assigned to respondent and his associates to permit their sole management of the properties, and this same procedure was followed as to her interest in the Tivoli companies.

The prohibition period in Colorado from 1916 to 1933 reduced the activities of the Tivoli brewery to the unprofitable making of near beer. Upon return of the brewing business in 1933, there was no surplus in the

treasury and the plant required modernizing and renewal, so there were no earnings to permit dividends from 1916 until late 1938. Due to the subsequent general business depression, handling of the other estate investments became difficult: leases were cancelled, loans were in default, mortgages required foreclosure, and income was uncertain. During the period from July 1, 1937, to November 15, 1945, petitioner took from the estate for personal expenditures over $463,000 and there was further paid out for her personal taxes, interest, etc., some $537,000, making a total paid out for her benefit of over $1,000,000, while, her total income for the period was approximately $637,000. During each of those years petitioner borrowed money in anticipation of income.

The record contains no charge nor inference that respondent failed in any respect to manage petitioner's business interests and properties and investments with diligence and skill during the difficult years of his control, or that he failed to use sound legal judgment either in directing her diversified business interests or in handling the family litigation arising in connection with her inheritance.

As analyzed by the referee and accepted by counsel, the two "causes of complaint" set out in the petition encompass four specific claims of misconduct on the part of respondent, which, considered in chronological order, are in substance as follows:

(1) That respondent failed and refused fully and correctly to advise petitioner as to the value of her properties and the income therefrom, and that the information furnished her was calculated to lead her to believe that her income was considerably less than it actually was;

(2) That in 1938 respondent advised petitioner that she should purchase the Burghardt interest in the Tivoli companies but that she did not have the money to purchase it, and that respondent would buy the stock for her and let her pay for it when she had the money; that

respondent did so purchase the stock, and held it until 1945 and received large dividends thereon, when, in fact, petitioner at all times had the necessary funds or credit to purchase said stock and had she been correctly informed as to its earnings and her ability to purchase it she would have purchased it directly from the Burghardt estate and received the dividends therefrom;

(3) That in May, 1945, petitioner called respondent by telephone asking him forthwith to advance to her the sum of approximately $20,000 from her estate; that respondent advised her that funds were not available for such advancement; that she did not have the necessary credit at the bank; that the only way she could secure the funds in question was to sell him stock in the Tivoli companies at the same price for which the Burghardt stock had been purchased in 1938; that petitioner, relying on his advice, sold respondent said stock at far less than its value; that respondent received large dividends thereon and that petitioner would not have sold said stock had she been properly advised.

(4) That the Tivoli companies held title to two Broadway properties in Denver of a value of not less than $40,000, and that without petitioner's knowledge said properties were transferred by respondent to a corporation solely owned by him for a consideration of $25,000 with the intent of realizing a personal profit thereon to himself.

Concerning the first charge of misconduct as listed above, it is not necessary for us to consider whether or not the mere failure of an attorney to give full information, or the giving of misinformation, to his client is such conduct as to justify disciplinary action regardless of wrongful motive or resultant injury, as insisted by petitioner. In any event this charge becomes an important consideration in determining the subsequent charges of misconduct. No claim is here made in behalf of petitioner that by reason of mental incompetence or youthful inexperience she was imposed upon by respondent.

The evidence discloses that petitioner was of mature years, and that she had enjoyed a successful business career prior to her marriage; and it overwhelmingly supports the finding of the referee that through correspondence, monthly profit and loss statements from the brewery, quarterly reports of her personal accounts, and state and federal income tax reports forwarded for her signature, she was kept advised by respondent as to her income and business and financial affairs intrusted to him. The record contains many letters informing petitioner with respect to various properties, recommending action to be taken, and asking for her wishes with regard to them. Her replies indicate, not lack of information, but complete indifference as to her business affairs except as to how she might obtain more money—now for a $35,-000 loan to an old friend, now for a trip to Paris, now to pay gambling losses, and now for making further payments on stocks bought on margin on a falling market. When respondent was writing her of leases being forfeited and money having to be raised for taxes and repairs on properties foreclosed, she wrote in connection with demand for money: "It must take all your time to keep me out of trouble. It is really very funny. * * * Where you can get the money is another thing * * * but that is your worry." Petitioner admits that the reports sent her by respondent were promptly destroyed; her memory was so undependable that she was uncertain on the witness stand whether she had taken one or two or three trips to Europe in recent years, and she testified that she was first approached about the purchase of the Burghardt stock a year and a half to two years after Burghardt died, when, in fact, the record contains letters from respondent regarding the purchase beginning within a month after Burghardt's death, and continuing until the stock was actually purchased approximately nine months thereafter. It further appears that she remembers only one report ever received from Tivoli, yet an accountant testified that copies were prepared month-

ly and placed in an envelope addressed to her, while in her letters to respondent she repeatedly expresses her delight at the statements and, on one occasion, she objected to the charging off of bad accounts by Tivoli for the reason that it resulted in a reduction of dividends.

As to the second charge of misconduct, the evidence discloses that respondent wrote petitioner promptly upon the death of Burghardt in 1936 advising that his one-eighth interest in the brewery would probably be for sale and that it would be advantageous for her to buy this stock and become the sole owner of the brewery, and suggesting that it was good business to keep a cash reserve on hand for such opportunities. Some months later he again urged the importance of her acquiring the stock, but petitioner was eager at the time to obtain advances against future income for a trip to Paris, and for a loan of some $30,000 as a favor to a friend in New York. Respondent wrote that if the sale came up while she was away he would try to purchase the Burghardt stock if he could get it at a reasonable price, and petitioner replied: "Tomorrow I sail. * * * Wilbur, think well before you buy Tivoli stock." Thereafter respondent did purchase the stock and wrote petitioner in substance that he thought it would be better for her to own all of the stock, but if she wanted him to keep part of it he would be willing to do so, that he had used his own money in paying for it because it was not available elsewhere, but that they could adjust that later when petitioner determined how much of it she wanted to purchase. In reply petitioner said on August 17, 1938, "I am very glad you bought the balance of Tivoli stock and we can settle on my visit if you wish to own any or not. Perhaps if you did own some you would work harder * * *." Thus the matter stood until January 30, 1942, when respondent voluntarily wrote petitioner declaring that his purchase of the Burghardt stock was made with the understanding and agreement that at any time petitioner elected to purchase at the price paid he would

transfer to her and at any time he elected to sell she would purchase at that price. During all the time of respondent's holding this stock, petitioner had full knowledge of the dividends paid and had regular reports of the financial condition of these companies as well as of her other properties, yet she never took any step or indicated any desire to take over respondent's interest. She chose to spend rather than to conserve her fortune. Only after her break with respondent did petitioner finally exercise the option to purchase which he had voluntarily given her, and this was then accomplished immediately by borrowing the necessary funds and ultimately through sale of other more conservative capital assets. Whether such sale in the high 1945 market brought sufficiently increased price over that obtainable in 1938 to equal the dividends paid to respondent in the meantime, does not appear.

It is charged by petitioner that included in her estate was an overdue note, owed by responsible people, which should have been then collected by respondent and the proceeds used to buy the Burghardt stock. The answer is fourfold: First, that petitioner never authorized the purchase of this stock, but warned respondent to "think well before you buy Tivoli stock," so that the purchase by respondent thereafter might well have been held as at his risk and not hers; second, that immediately after his purchase he recommended that she take it over and she suggested that if he kept it he would work harder; third, that for her protection he made a voluntary declaration of her right to purchase at any time; and fourth, it must be remembered that the Tivoli stock had made no profit for more than sixteen years; it was currently profitable but its future was uncertain, its actual value was unascertainable, and it was a very speculative investment; the purchase of the Burghardt stock was desirable, not as a separate investment, but to protect the large interest she already had therein and the Denious ownership gave her such protection. Not only does the

evidence support the referee's finding of respondent's good faith therein, but the correspondence shows zealous care by respondent to protect petitioner in the face of her own complete indifference, by advancing his own money for the purchase of the minority stock in order to prevent its acquisition by outside, and perhaps unfriendly, interests.

As to the third charge of misconduct. In the latter part of April, 1945, petitioner drew three postdated checks to cover losses of approximately $20,000 sustained at a gambling house in Florida and was without funds to meet them. She both wrote and telephoned respondent urging him to sell property or get the money from any source, but not to divulge the purpose for which it was required. In response respondent wrote, in part: "For the purposes you have in mind your Tivoli stock is perhaps the most logical thing you could sell, provided you retain at least 50 per cent of the stock in the company. As you know, I purchased the interest held by Mr. Burghardt in the three associated companies, Tivoli, Western, and Fortuna, and when I refer to Tivoli, I mean the three companies. We made an agreement whereby you agreed to take this stock off my hands at my request at the price paid for it, and I agreed to sell the stock to you at your request at the price I paid for it. I would be willing to buy additional stock to the amount of, say, $20,000 a year on the same basis and with the same agreement that we make funds available to you on which no income taxes would be due, and in the meantime the companies would be in your control, and the stock I purchased would be subject to repurchase by you just the same as the Burghardt stock is now. I would want you to agree not to sell the remainder of your stock to anyone else, and I would agree not to sell my stock to anyone but you. * * * I am not urging or even approving this proposition, because it is contrary to the advice I have heretofore given to you, not to spend principal; but if you insist upon spending principal, then this prop-

osition is as good as anything I can devise. If it appeals to you, please let me know, and I will prepare a formal agreement which I would like to have you submit to your attorney at West Palm Beach, Mr. Cain, with whom you have consulted on other matters." Petitioner telephoned her acceptance; made the sale, with right to repurchase as proposed; received the money; wrote respondent that when she came out in June she would talk things over with him, and, as she testified, "thought one day I would sell a piece of property and buy back the stock." This expedient saved sacrifice of other property at forced sale, saved income tax obligation and enabled petitioner at any time she desired, by conserving income or selling other property, to repurchase the stock. As in the case of the Burghardt stock, any advantage to respondent or loss of dividends to petitioner was contingent upon earnings of the brewery and also upon the desire of petitioner that respondent continue to hold the stock. The evidence supports the finding of the referee that therein respondent was acting primarily in the interest of his client and for what he believed to be her best interests.

As to the fourth charge, the Tivoli companies had made loans on two Broadway properties and later acquired title to them through foreclosure, or by conveyance in lieu of foreclosure. They were carried on the books at slightly less than $10,000 and $15,000 respectively, making a total valuation of $24,120. In July, 1945, respondent took conveyance of these properties to a corporation of which he was the sole owner, paying for them the sum of $25,000. These properties were then worth on the market at least $40,000, and conveyance was made without appraisal or investigation of value and without the knowledge of petitioner, who owned approximately 87½ per cent of the stock of the Tivoli companies. There was testimony that an offer had been submitted to respondent's office of $25,000 for one of these properties alone shortly before his purchase, but

respondent testified that the only offer submitted was of $15,000, not $25,000. Respondent and the manager of the brewery both testified to the effect that these companies were not in the real estate business; that it was their policy to dispose of properties acquired through foreclosure as soon as cost could be realized, except for tavern properties; that $25,000 more than covered their cost and that the manager suggested to respondent that they be sold at that price and that respondent purchased at that price with the intent, as declared to the manager, of taking them subject to petitioner's approval. Thereafter, upon petitioner's belated visit to Denver and expressed disapproval of the sale respondent promptly reconveyed.

The question of respondent's intent in taking title to these properties is the all-important question involved in this proceeding. If, as he declares, and as the manager testified he was told, respondent took title subject to petitioner's approval and with intent of obtaining her informed consent thereto, the transaction was still improper, but not venal nor sufficient cause to justify disbarment or suspension in the situation here presented; however, if taken without such intent, it was venal and demonstrated lack of the integrity and honor requisite for one accepting the confidences and assuming the obligations of a member of the bar. After listening to the testimony, seeing and hearing the parties and witnesses, considering the surrounding circumstances and carefully evaluating the evidence as only the trier of facts is in position to do, the referee, who is an experienced trial judge of long and eminent service on the bench, found that in buying these properties, "Mr. Denious acted in good faith and with the intention of fully disclosing the transaction to Mrs. Kent, and if the same did not meet with her approval to cause the properties to be conveyed back to the respective companies."

Under customary practice and our rules of

procedure (Rule 53 R.C.P. Colo.) we should accept the referee's findings unless clearly erroneous. *In re Grorud,* 84 Mont. 221, 275 Pac. 1098. We have said with reference to similar hearings before the committee on grievances of the Colorado Bar Association: "Every presumption indulged in favor of the action of trial court or jury should be, and is, indulged in support of its findings and conclusions." *People ex rel. v. ........,* 90 Colo. 440, 9 P. (2d) 611. As aptly stated by the Oregon court in a similar proceeding, *State ex rel. v. Goldstein,* 109 Ore. 497, 220 Pac. 565: "While the findings of the referee are advisory only, yet when a judge of the Circuit Court, because of his high character, wide judicial experience, and well-recognized legal attainments, has been selected by this court to take and report the testimony, together with his findings and conclusions of law, his findings are entitled to great weight." We have given careful study to the record to that end, and from such study we here note a few of the considerations influencing our conclusion thereon.

There is apparent from the record a friendship and intimacy and mutual confidence existing between respondent and petitioner far beyond the normal relationship of attorney and client. In their correspondence, business matters are joined with personal and social references. When respondent purchased the Burghardt stock with his own money, without knowing whether or not petitioner desired to own all or any of it, he took title, not in his own name but in the name of her company. In the event of his death there would have been no record of his ownership of this $40,000 investment and no assurance to his estate except petitioner's integrity. Yet his confidence was such that he permitted the title so to remain in her company for a long time. In their correspondence she frequently expressed her feeling of obligation to him, and was not at all nigardly with her fortune, as the record eloquently discloses. He had long shouldered the entire burden of handling her

extensive interests through the difficult depression years. He might well assume that he would continue in her service and be entitled to further substantial fees. Taking title to the properties here involved at the book value would have had a distinct advantage to him from the standpoint of taxation and might well have been considered by both of them as in recognition of services performed.

It is strenuously urged, that the failure of respondent promptly to write petitioner of his purchase of the property and his failure to mention it in their several meetings after her return to Denver until he was specifically charged with the purchase, demonstrated his bad faith. She had written that she would be in Denver in June and was expected shortly, but her visit was repeatedly postponed and much happened before her arrival. Respondent's former confidential secretary had been employed by another firm of attorneys and while petitioner testified that she had not seen this secretary for three years, and had never written her, it appears that the secretary had twice written petitioner complaining bitterly of respondent. The wife of a Denver attorney without previous acquaintance had called on petitioner in New York City at the suggestion of respondent's former secretary, and had lunch with her. Petitioner received anonymous letters and warnings from other sources— which she declined to reveal—that the Denious family had obtained a controlling interest in her property. She had been visited by a real-estate man from Denver whose conversation caused her some concern about her affairs, and finally, had received a telephone call from some unknown person asking her if she had sold any of her properties to respondent and saying that deeds conveying some of them were on record in Denver. Thereupon she telephoned from New York to the former Denious secretary and straightaway took train for Denver, where she first conferred with the secretary and with Mr. Ireland before visiting or calling respondent.

For the first time in twenty years she appeared in his office without writing in advance, and forthwith demanded full report of everything she owned, of all of her income, and of everything that had been sold since 1931. She was tense and hostile from the moment of her arrival and both she and respondent were angry throughout their subsequent conferences. When she asked if he had sold any of her properties, he answered in the negative, explaining afterwards that the properties to which he had taken title were not hers, but those of the Tivoli companies, of which she was not the full owner. When these properties were specifically mentioned, respondent admitted the transfer, but was evasive as to title being in his own company. However, as the referee found, there was no attempt to conceal the transactions, and upon their first being mentioned, respondent immediately offered to and did transfer the property back to the Tivoli companies from which they had been transferred. The referee found that "Mr. Denious' statements and conduct, while tending to show an intent to conceal the true nature of the transaction, may be accounted for by the tenseness of the situation, the charges of unfair dealings which had just been made by Mrs. Kent, the unfair advantage which he believed she was taking of him, and the anger both he and she exhibited, for Mrs. Kent testified, 'I couldn't think of anything else. I was so mad I couldn't think of anything else. I left * * * I walked out.' "

 It is a well-settled rule, and we have repeatedly held, that judgment of disbarment should only be pronounced on clear and convincing proofs. *People ex rel. v. Tanquary*, 48 Colo. 122, 109 Pac. 260; *In re Baum*, 32 Ida. 676, 186 Pac. 927. In the present case, the evidence that respondent acted with intent to defraud is, at best, not free from doubt. We have further held that the previous reputation and standing of a respondent in disbarment proceedings "is a matter entitled to much

consideration." *People ex rel. v. Benson,* 24 Colo. 358, 51 Pac. 481. Here, respondent has been for many years a distinguished member of the bar, eminently successful in his profession, receiving its highest honors, active in improving its efficiency and promoting its welfare and without previous charge or accusation against him. From all these considerations we cannot say that the referee's finding that respondent acted in good faith in these transactions was clearly erroneous, and such finding is affirmed.

Other than for review of the referee's findings of the four specific claims of misconduct, only two questions are raised by petitioner's assignments and brief, to wit:

■ First: It is repeatedly charged throughout petitioner's brief that respondent improperly refused to submit records necessary to a full accounting in her behalf. It is elementary that requests for such information, if made in good faith, must have been first presented to the referee, who had full authority to compel its submission, and in cases of the refusal of the referee to order production of the evidence, then objection should have been here interposed to his ruling thereon. In the eighty-one objections made by petitioner to the referee's report, we find not one based on refusal of the referee to require respondent to disclose information or produce records, and in the evidence we find not a single request that the referee require submission of records or other evidence to which petitioner had been refused access. There is no possible merit to this charge.

■ Second: Petitioner urges error in the refusal of the referee to receive and consider certain tendered evidence involving other alleged transactions in nowise connected with the items of misconduct charged in the petition. This so-called evidence consists of a written offer of proof presented to and rejected by the referee, and a further "Amended offer of proof," presented to this court long after the hearing of the charges against respondent had been completed and the referee had sub-

mitted his report thereon. In considering these tenders, it must not be overlooked that they are mere statements of counsel; that there is no proof in the record to substantiate them, and that respondent has had no opportunity to answer them; accordingly we cannot consider the statements in these offers as evidence, but only determine whether the referee erred in rejecting the first offer and whether we should reopen the case to consider the second. If their rejection was not error, then they should not be considered by us for any purpose, any more than we should consider rumors whispered on the street; if rejection was error, then we must either again refer the case for proper testimony in behalf of both parties as to these new charges, or summon the parties before us and ourselves hear what evidence petitioner has to present in support of her new charges and what evidence respondent has to offer in denial. For us now to consider these statements as evidence would be to accept unsworn and hearsay statements without affording opportunity for answer, and so violate the fundamental principles of procedure and of justice.

It may be noted that this ruling of the referee was first challenged by petitioner in her reply brief, and under the usual rule would be considered as waived; further, the evidence tendered in petitioner's offer of proof of similar transactions is so comingled with evidence having no competency, relevancy or similarity to any act charged in the petition as to justify its exclusion by the referee on that ground alone. "When an offer of proof is made, some of which is good and some bad, the court is not required to separate the offer and admit the competent, and reject the incompetent, evidence." *Davis Co. v. Jewelry Co.*, 47 Colo. 68, 104 Pac. 389.

Respondent was not called upon to answer or defend against any matters not contained in the charges specifically set out in the petition. The right to be informed in advance of accusations to be made is funda-

mental in our Anglo-Saxon law. No attempt was made to amend the petition to include other charges than those considered by the referee. Evidence as to these other alleged transactions was tendered to show intent only. The admission of evidence of similar transactions on the issue of fraudulent intent, is based on the inference of such intent in the transaction at issue because of like intent being shown in other similar transactions. Such inference is far from conclusive, and this character of testimony, it has been held, should be admitted by the court with caution. *McKay v. Russell*, 3 Wash. 378, 28 Pac. 908. As is well stated in 32 C. J. S., p. 433, §578: "The courts have realized that the admission of such evidence involves the practical inconvenience of trying collateral issues and protracting the trial, and that it may occasion surprise or other prejudice to litigants, and that it may bewilder and mislead a jury. * * * the admission of evidence of similar acts * * * rests largely in the discretion of the trial court." Here the charge at issue is, that respondent's conveyance to himself of his client's land was made with intent to defraud. The tendered evidence which concerned similar transactions consisted of a statement that on two other occasions property belonging to petitioner or to a Tivoli company had been deeded to a corporation belonging to respondent. There is no suggestion that respondent admitted fraudulent intent in these other transactions or that there was any stronger proof there than here, that petitioner did not know of, or consent to, such conveyances. Accordingly, if admitted in evidence, the "similar transactions" would have involved the same witnesses, the same evidence, the same question as to credibility between petitioner and respondent and the same ultimate doubt as is involved in the transaction here at issue. It would no more tend to prove petitioner's contention than that of respondent. Evidence of similar transactions should not be admitted unless clear and convincing. "Evidence of a

vague and uncertain character offered for the purpose of proving that the defendants had been guilty of similar offenses should never be admitted under any pretense whatever." *Baxter v. State,* 91 O. St. 167, 110 N.E. 456.

■■ These other transactions, of which evidence was tendered, occurred, one eleven, and the other six years before the act here charged. In criminal proceedings we have repeatedly held that evidence of similar transactions to be admissible must have occurred within the period of the statute of limitations. *Curtis v. People,* 72 Colo. 350, 211 Pac. 381; *Abbott v. People,* 89 Colo. 121, 299 Pac. 1053. Even when not bound by that rule courts are not avid to hear stale claims, where frequently memories are dimmed, witnesses gone, and records lost. The determination of whether similar transactions sought to be shown are too remote to be admissible is usually held within the sound legal discretion of the trial court. *State v. Hall,* 45 Mont. 498, 125 Pac. 639; *Spurr v. United States,* 87 Fed. 701, 31 C. C. A. 202. The referee did not abuse his discretion in rejecting the tendered evidence.

■ It is further urged that respondent invited a complete investigation of all his professional conduct by the allegation in his answer that for more than forty years he had served the members of the Good family faithfully, honestly and loyally; however, it was the referee, not respondent, who had the responsibility of the hearing and who rejected the tendered evidence. He could properly hear and determine only the specific charges contained in the petition before him. In hearing those charges he was required to observe the usual rules as to the reception of evidence, and the question for our determination is not what respondent "invited," but whether the referee erred in rejecting the tendered evidence as applied to the specific charges set out in the petition.

Petitioner's attorneys, Messrs. Ireland and Ireland, requested permission personally to prosecute their complaint herein. This request was not granted, but the attorney general was requested by the court to prosecute with the assistance and cooperation of petitioner's attorneys. At the hearing, the latter conducted the examination of every witness in behalf of the court and the participation of the attorney general's office was confined to occasional objection and argument. Counsel for petitioner in such a proceeding first, owe loyalty to their client; their main purpose must be to please her, and their approach is almost necessarily partisan, while in a disbarment proceeding as in a criminal prosecution, the prosecutor should represent the public interest alone and have no responsibility except fairly to discharge his duty therein. Accordingly, we do not commend the instant procedure as a precedent.

In conclusion, we must not be understood as approving the actions of respondent in accepting the conveyance of the Tivoli properties as shown herein. While formally dealing with the Tivoli corporation, respondent was in effect dealing with petitioner herself, and notwithstanding his good faith and his intention of disclosing to petitioner the conveyance of the land and of accepting the same subject to her approval, such conveyance by an attorney or trustee without making full disclosure to the client and obtaining her informed approval before recording or delivering the deed, was unwise and improper. Such conduct exposes the attorney himself to suspicion of fraud and to temptation to avoid candid and unbiased disclosure; it gives him a selfish interest in his client's decision wherein she should have disinterested advice; it deprives her of equal freedom of choice in acceptance or rejection, and in the event of his death might jeopardize her very power of rejection. As was said in a somewhat similar situation: "The relation of attorney and client which here existed required

that the defendant before accepting the deed should have used active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and should have seen to it that his client had independent advice in the matter or else should have received from him such advice as he would have been expected to give had the transaction been one between his client and a stranger, and should have seen that his client was so placed as to be enabled to deal with him at arm's length without being swayed by the relation of trust and confidence which existed between them." *Webster v. Kelly*, 274 Mass. 564, 175 N. E. 69. Such conduct must be condemned and respondent is hereby reprimanded therefor, regardless of his intent and good faith therein.

It appearing from a full review of the record that respondent represented petitioner diligently and well, and that the evidence supports the findings of good faith and honest intent in all the transactions challenged in the petition herein; it is ordered that the proceedings be dismissed.

MR. CHIEF JUSTICE BURKE, MR. JUSTICE HILLIARD and MR. JUSTICE ALTER dissent.

MR. CHIEF JUSTICE BURKE and MR. JUSTICE ALTER dissenting.

We regret our inability to concur in the court's opinion. We concur in the court's condemnation of the real-estate transaction in which respondent took title to the property for $25,000.00, but not in the conclusion acquitting respondent of an improper motive.

We think the same condemnation and the same finding of improper motive as to the Tivoli stock transactions inescapable.

Indulging every permissible presumption in favor of the report of the Referee on all other matters covered,

we dissent from that report and from the court's opinion as to those two features and feel that a penalty reasonably commensurate with our view of the gravity of those transactions should be imposed.

Moreover, in respondent's answer he alleges that, "For more than forty years I have served the members of the Good family and petitioner faithfully, honestly and loyally. I have gone beyond the requirements of a legal representative and given them, through the best years of my life, first place in my planning, my efforts and accomplishments for their benefit and profit." This was an invitation by the respondent for a complete investigation of all his professional conduct covered by that allegation. When additional charges were tendered, he objected to evidence thereon, and that objection was erroneously sustained. When, under such circumstances, the professional conduct of an attorney is under investigation and it becomes proper, as here, to go beyond the specific charges, his only recourse is a request for reasonable time within which to prepare to meet those charges.

MR. JUSTICE HILLIARD dissenting.

A disciplinary proceeding by the People of the State of Colorado, upon the relation of LoRaine Good Kent, petitioner, against Wilbur F. Denious, a member of the Colorado Bar, respondent. The charges were set forth in a petition, duly verified, which petitioner's counsel lodged for filing. May 1, 1946, the Court having examined and considered the petition, ordered the filing thereof, and simultaneously ordered respondent to show cause, etc. In the interest of reserved presentation, we directed the "Attorney General, with the assistance and co-operation of Messrs. Ireland and Ireland [Petitioner's counsel], to prosecute the cause." May 25, 1946, respondent filed answer to the charges, and June 5, 1946, replication was filed. June 7, 1946, the matter was referred to

the Honorable H. E. Munson, a district judge. He was "authorized to settle the pleadings, fix the time and place of hearing, compel the attendance of witnesses, take testimony, rule on the admissibility thereof, cause it to be reported and transcribed, and in all other respects exercise full discretion herein, subject only to the final decision of this Court in the premises and final judgment by it." August 14, 1946, it appearing that Judge Munson had departed this life, the Honorable John M. Meikle, also a district judge, was appointed successor referee, "with all the duties and powers imposed on his predecessor by our order of June 7, 1946."

August 28, 1946, the matter came on for hearing before the referee, acting pursuant to our orders of June 7, and August 14, 1946, stated above. The People of the State of Colorado appeared by H. Lawrence Hinkley, Esq., Attorney General; Duke W. Dunbar, Esq., Deputy Attorney General, and James D. Geissinger, Esq., Assistant Attorney General; the petitioner by Clarence L. Ireland, Esq., and Gail L. Ireland, Esq., her attorneys, and the respondent by Kenneth W. Robinson, Esq., Ralph L. Carr, Esq., and Hudson Moore, Esq., his attorneys. To the referee's inquiry whether the parties were ready, Mr. Clarence Ireland for petitioner, and Mr. Carr for respondent, responded in the affirmative. Deputy Attorney General Dunbar, speaking in behalf of his chief, addressed the referee, saying: "The record may show that the Attorney General has been ordered by the Supreme Court to prosecute this case, and Ireland and Ireland have been ordered to assist the Attorney General in this prosecution. Because of the detailed knowledge of Ireland and Ireland as to the evidence which is to be presented, we have asked them to take a very active participation in the conduct of these proceedings. It is the desire of the Attorney General to see that all evidence pertinent to the issues herein is offered for the consideration of the Court, and it is also his desire to

refrain from any technical objections to anything which the respondent may have to offer to explain his position in the matter. With that in mind, we are ready to proceed." Counsel made opening statements, and the referee announced that he would "hear testimony and report to the Supreme Court." Further, that the "hearing will be a closed" one, that is to say, spectators were excluded altogether, and witnesses under the "rule."

The charges have to do with respondent's stewardship as petitioner's counsel over a considerable period. Petitioner's estate, accumulated by the late John Good, a Denver pioneer, and which subsequently was owned or controlled by the late John E. Good for himself and his mother, the late Rosalie M. Good, son and widow of the original John Good. January 12, 1937, petitioner, the widow of John E. Good, through the latter's will and the will of the widow of John Good, became the sole owner of the entire estate, then estimated to be of value in excess of one and one-quarter million dollars. Respondent, who theretofore, and since about 1902, had been attorney for the several Goods and their estates, became counsel for petitioner. Until the advent of petitioner, the Goods, father and son, either in their individual names, or in the names of corporations, the entire stock of which they owned, and of which they were directors and officers, managed and controlled their large holdings, and determined the policies thereof. But when petitioner became owner thereof, respondent and members of the staff of his law firm, being provided with a share each in the several corporations, became the sole directors and officers thereof, respondent occupying the presidency in each instance. From that time, and until shortly before November 19, 1945, when petitioner engaged other counsel, respondent enjoyed her unquestioning confidence and faith, and handled the affairs of her estate as his judgment dictated, determining all legal questions and problems, just as he had done for the generations of

Goods, and in addition thereto determined business poli-
cies and property management and disposition, which in
the days of the Goods they determined for themselves.
What petitioner paid respondent for his services does
not appear, but evidently it was satisfactory to him, for
in his answer he alleged that when his services were
terminated November 19, 1945, petitioner suggested pay-
ing any balance due to that time "at the rate at which I
had been paid in the past," to which "I agreed." "Short-
ly thereafter," as he further stated in his answer, "pay-
ment was made of the fees agreed." It is important to
keep in mind, that, through the corporations which held
title to petitioner's real estate and her stockholding in-
terests in other companies, respondent, as president
thereof, and with the acquiesence of the other directors,
lawyers in his office (who testified that they knew noth-
ing about the affairs of the said corporations and signed
such minutes as were prepared and submitted to them
for that purpose), was in position to convey real prop-
erties or transfer stock certificates or other personalty
belonging to petitioner, at his pleasure. Also, upon like
premise, respondent determined when, and at what rate,
dividends, if any, should be declared in relation to any
of petitioner's corporations. Or, as stated by the referee,
respondent had "full management and control and took
full responsibility for the operation of the companies
for the preservation and management" thereof. In the
course of his stewardship, respondent maintained bank
accounts, in which he made deposits of petitioner's funds,
sometimes directly, other times by indirection, that is to
say, on occasion he would make original deposit of funds
belonging to her in his personal account. In connection
with the latter method of handling petitioner's funds,
there were instances, as she offered to prove—not per-
mitted by the referee, when funds belonging to her or
her companies were retained by respondent to his own
use. These instances will be identified and stated in the

course of this opinion. Petitioner did not have access to any of these accounts, and enjoyed use of her income only as, and in sums determined by, respondent, effectuated by deposits made by him in a certain account on which petitioner could draw checks. In none of the corporations, although she owned them all, was petitioner a director, nor was there any evidence that she was supplied with copy of minutes showing corporate action in any instance. It is not so much in criticism that the foregoing is emphasized, as it is to indicate the extent to which petitioner trusted her attorney, and that his responsibility in the premises adequately may be appraised.

The several charges comprehend that respondent, the petitioner's retained, remunerated and trusted counsel, clothed with unlimited control and management of her properties in manner and detail appearing, betrayed his trust, and proceeding calculatingly in the interest of his own enrichment, over-reached petitioner in several particulars, to her undoing in great sums. So far as it is necessary to consider the charges in detail, they will be taken up in the order in which they were considered by the referee. Considered in the light of evidence received which was relevant and pertinent to the charges, there is absence of material conflict. The story in each instance is simple, the implications do not admit of doubt, and difficulty of determination does not attend. Out of a spirit of fairness, as I doubt not, the referee, himself given to generous promptings, and moved as well by the suggestion of the Attorney General, also well disposed to fairness, that technicalities be not allowed to prevent respondent from explaining his position in the premises, the referee permitted respondent to consume days in presenting evidence, including voluminous correspondence, wholly without pertinence to the charges involved. That, generally, respondent guided petitioner and her business affairs along well-advised courses, may not be

gainsaid. Also, so far as appears, respondent protected petitioner's holdings from threatened incursions by third parties. In an instance, however, which I shall discuss as I consider one of the charges, it is clear that respondent favored the mere convenience of certain other wealthy clients as against the legal right of petitioner to exact payment from them of an overdue and unpaid written obligation, in a sum amply sufficient to have enabled petitioner to purchase certain corporate stock which respondent himself advised was of prime importance. Instead, respondent, not even deigning to let petitioner know of the obligation of his other clients to her, and of which she was ignorant, prevailed upon her to adopt a plan, which, while incidentally favorable to his preferred clients, comprehended a material gain to himself and a substantial inroad upon petitioner's holdings.

Before taking up the several charges, as such, it is important to note that of the assets which finally became the property of petitioner, there was a note for $45,000, bearing interest at 6% per annum, secured by first deed of trust on property known as Harwin Apartments, 1566 Logan, Denver. That in addition thereto and in connection with said apartments, the obligation comprehended an additional sum of $5,500 for furniture. Another such obligation consisted of two notes, $5,000 and $500, interest 6%, secured by two deeds of trust on Denver property. Still another such obligation was a note for $5,000, 6% interest, also secured by deed of trust on Denver property. These several deeds of trust were foreclosed by respondent in manner and form hereinafter appearing, but petitioner was never advised thereof. Petitioner first learned of the mentioned foreclosures when her accountants were examining the books, and discovered discrepancies between the books of her companies which owned the loans and the books of respondent, that is to say, generally, how much he had realized from such foreclosures and how much less he had covered into the companies. But before the accountants could examine

exhaustively they were denied further access to respondent's books. Petitioner offered to show the foregoing in detail, to which respondent's objections based on absence of specific charge was sustained by the referee. Thereupon petitioner made tender thereof in considerable detail, which as summarized by counsel, is as follows:

"That the records of the Western Products Company showed one of the assets of the Western Products Company at the time of John E. Good's death in 1931, to be a promissory note for $45,000.00 signed by one Harry Weinstein, said note being dated September 4, 1930, due in three years, and bearing interest at the rate of 6% per annum and secured by a first deed of trust on certain Denver property known as the Harwin Apartments, 1566 Logan Street, Denver, Colorado; that the Western Products Company advanced the further sum of $5,-500.00 for furniture in the Harwin Apartments on November 28, 1933, making a total investment of $50,500.00; that certain payments were made upon the principal by checks of the respondent about one year after the property had been foreclosed, and held in the name of a dummy, H. R. Herian, who had no interest in the property and made no payments thereon. The payments by respondent were made during the months of September, October and November, 1934, in the total sum of $49,-675.39; that following said payments and on December 31, 1934, there was charged off on the books of Western, on account of loss on this investment, the sum of $824.61.

"That if Robert Stewart, certified public accountant, a witness in behalf of petitioner, were permitted to testify, he would testify that as an accountant working under the direction of Mr. Lindsey he secured the following information from a ledger in the respondent's office: That the respondent collected rentals from this apartment house from January 1, 1934, to November 1, 1934, in the sum of $8,275.34; that said ledger sheet further showed that $5,351.70 of this amount had been paid to

Western Products during the year 1934; but the books of the company do not show the receipt of the same or any part of it by said company; no ledger sheets were presented relative to the payment of the said $45,000.00 by the respondent for the use of the Western Products Company, and the books of the Western Products Company do not show any foreclosure; that the abstract of title to the said Harwin Apartments shows that on November 16, 1933, one H. R. Herian, as plaintiff, started a foreclosure suit against the owners of this property and filed a Lis Pendens to that effect; that, as a result of this suit, the property was deeded to H. R. Herian who, at that time, was the respondent's secretary; that on November 17, 1943, the abstract shows a deed from said Herian to the Beloit Company, which company, according to the records in the office of the Secretary of State, was a corporation without any assets; that attorneys for the respondent had admitted that said company was a dummy corporation, used for the purpose of taking title to properties controlled by the respondent, and not only this property but numerous other properties belonging to the petitioner were placed in the name of the Beloit Company by the respondent without the knowledge of the petitioner or her consent; that following, and on November 27, 1934, said Beloit Company deeded said property to one L. H. Guldman; that one Morris H. King would, if permitted to testify, show the purchase price of said property, according to the books of L. H. Guldman, to be $65,000.00, less certain adjustments; that one Sanford Gregory, an agent with Van Schaack & Company, if permitted to testify, would testify that the purchase price was $65,000.00, and the net price after adjustment was $63,229.55; that the deed from said Herian to the Beloit Company bore revenue stamps in the sum of $7.50; that said Alexander J. Lindsey, if permitted to testify, would testify there are no entries on the books of the Western Products Company showing that said company received the total amount, $63,229.55, or any

sums in addition to the amount set forth, namely $49,-675.39; that no rents were accounted for after October 1, 1933, to the date of sale on November 27, 1934, and that it is apparent from the records of the Western Products Company, the respondent's records, Van Schaack & Company's records and the Guldman records, that the respondent failed and neglected to account to the Western Products Company on this transaction for a sum of approximately $23,000.00; that since the respondent refused to furnish the petitioner or her attorneys and accountants with the complete records, it is impossible to state the exact amount not accounted for.

"The petitioner made a further tender of evidence as follows: That among the records of the assets of the John Good trust at the time of the death of John E. Good, were two promissory notes signed by one James N. Doyle, dated April 28, 1930, payable to one Hudson Moore and evidently endorsed by said Hudson Moore to said John Good trust, in the sums of $5,000.00 and $500.00, respectively, each being due within one year, bearing interest at the rate of 6%, secured by two deeds of trust, namely, a first deed of trust on Lots 3 and 4, Block 6, Alkire Brothers Addition to Broadway Terrace, Denver; and a second deed of trust on Lots 39 to 42, Block 26, Arlington Heights, Denver, subject to a $13,-000.00 deed of trust; that the records of said Montgomery R. Smith, an accountant then employed by said respondent for the Good trust, show that interest was paid on said $5,500.00 to March 2, 1932; that the first abovementioned piece of property was foreclosed on December 31, 1933, whereas the abstract of title to said property shows that it was quit-claimed by said James N. Doyle, owner of the property, to the Niles Company on May 3, 1932, which company, according to the records of the Secretary of State's office, was a dummy corporation of the same kind and nature as the Beloit Company; that said Niles Company deeded the said property to the Beloit Company on May 5, 1932, another

dummy corporation that the respondent held title to this property and a number of other properties in said companies; that on December 2, 1935, the Beloit Company deeded said property to the Erie Investment Company, at which time the respondent held all the shares of stock in said Erie Company, except two shares issued to qualifying directors; that thereafter said Erie Company deeded the property to one Ben K. Lantz, which bore revenue stamps in the sum of $3.50, and that the said estate received, according to said Montgomery R. Smith, $3,198.78, and that the books of Western showed a loss on said loans in the sum of $2,204.50; that an abstract certified by The Landon Abstract Company respecting the second piece of property above described, shows that on May 3, 1932, said Doyle deeded the property to the Niles Company; that said Niles Company deeded the property to the Beloit Company on May 25, 1932, and that said Beloit Company deeded said property on June 1, 1940, to the Neosho Investment Company, which company, according to the testimony in the case, was a company wholly owned by the respondent; further, that said $13,000.00 first deed of trust was still outstanding and a lien against said property on the 15th day of July, 1946, as certified to by the Landon Abstract Company.

"That there was further tender of testimony as follows: Among the assets of the Fortuna Investment Company at the date of the death of John E. Good, was a promissory note dated June 4, 1928, in the sum of $15,-000.00, payable three years from date bearing interest at the rate of 6%, secured by a first deed of trust on property located at 29th and Champa, Denver, Colorado, which deed of trust was to the Public Trustee for the use of Hudson Moore; that title to said property at said time was in Maurice H. Spiegleman and Simon Spiegleman; that by mesne conveyances, one Florence B. Burns, became the owner of the property on June 9, 1929, subject to the above deed of trust; that said Burns, to avoid a foreclosure, deeded the property to the Niles Com-

pany, a dummy corporation; that thereafter and on May 25, 1932, said Niles Company deeded the property to the Beloit Company, a dummy corporation; that the title remained in said Beloit Company until September 29, 1938, when title was transferred to said Fortuna Investment Company, one of petitioner's companies; that said Fortuna Investment Company, at the time of the trial, owned said property; that the records of the Fortuna Investment Company show that interest was paid regularly on said loan up to January 4, 1939; that said Fortuna Company's books further show the respondent remitted rentals collected on this property from April 12, 1939, to November 19, 1945, when the respondent was discharged as attorney and as an officer and director of the Fortuna Investment Company.

"The petitioner offered to prove through said Robert Stewart that he had made an examination of the records in the respondent's office on or about July 11, 1946, and that the records in the respondent's office for the years 1933 to 1938 show that the respondent collected rentals on the above described property which exceeded the interest paid to the Fortuna Investment Company, the taxes, repairs, and all other expenses in the sum of approximately $450.00; that statements for rentals collected between 1931 and 1932 were not available for examination; that while Stewart was in the midst of securing complete data on this from respondent's office, he was prevented from making any further examination.

"Attorneys for the respondent objected to these offers and the Referee denied the admission thereof, to which petitioner's attorneys excepted. The purpose of this evidence, as counsel for petitioner argues, was to show the course and manner in which the respondent dealt with the petitioner's properties; that the records of the Fortuna and Western Companies and the John Good trust were not in accordance with the facts; that the respondent had collected numerous sums of money belonging to the Good estate and said companies which did not

appear on the records of said companies or in the records of said Good trust estate, as presented by said respondent to the petitioner's attorneys and accountants; that said facts, if permitted to be introduced in evidence, would show a course of conduct on the part of the respondent to the effect that he was concealing information concerning the petitioner's properties and had been for a number of years, all of which would have a direct bearing upon the intent of the respondent at the time he took title to the properties at 116-122 Broadway and 2071-2075 Broadway, involved in one of the specific charges."

Considering that the "relation of attorney and client is one of special trust and confidence" (*Enyart v. Orr,* 78 Colo. 6, 238 Pac. 29), and in which, "within ethical limits, the lawyer owes entire devotion to his client's interest" (*Mutter v. Burgess,* 87 Colo. 580, 290 Pac. 269), I think the tendered evidence should have been allowed. While the matter sought to be shown is not of specific instances charged, it is within the scope of the petitioner's general allegations to the effect that respondent has neglected and failed to advise relative to her properties. Besides, by respondent's answer, fully to be commended, he invited inquiry into his stewardship from the days of the elder Good to the present, that is to say: "For more than forty years," he alleges, "I have served the members of the Good family and the petitioner faithfully, honestly and loyally." The evidence sought to be introduced, as I am persuaded, indicated quite otherwise. In effecting foreclosure in the several instances appearing, respondent resorted to the not unusual method of having the fee owners of the mortgaged premises make conveyance thereof to third parties, rather than pursuing the more orthodox court proceeding or statutory trustee's sale. Regardless of the plan of foreclosure adopted in any given instance, respondent, representing the holder of the secured indebtedness, unless directed otherwise, might well have employed which-

ever method he believed would further the interests of his client. In the several instances here, respondent, acting as counsel, chose the conveyance method, and caused the several properties to be conveyed, in one instance to his secretary, and in the other two instances to a "dummy" corporation which he controlled. Thereafter, according to the tendered showing, respondent treated the properties as if they were his own, rather than as foreclosed properties being held for companies of the Good estates, latterly the property of petitioner. By means thereof, and accounting for interest on the loans long since foreclosed, rather than the rentals which he collected, a much greater sum, and by sale of some of the properties at prices greatly in excess of the indebtedness represented by the original liens thereon, respondent profited in the sum of $23,000.00, to the undoing of petitioner in the like sum. Whether the proffered evidence could have been adduced, I do not know, but considering the implications thereof, particularly in a disciplinary proceeding where the respondent, as here, has pleaded his faithful stewardship in behalf of the several owners of the properties of the estate, including petitioner and the properties involved in the tendered evidence, "for more than forty years," I think the referee should have accepted the tender, with leave, of course, to respondent to proceed in relation thereto as advised. Instead of having recourse to technical objections to the receipt of the evidence, as was respondent's course in the premises, I think the situation required that he rise boldly to the challenge.

Subsequent to the filing of the transcript of the proceedings before the referee, and his report thereon, but before the inquiry had been argued and was at issue before us, petitioner tendered for filing what was called "an amended offer of proof," based on evidence taken in a "private accounting action between" petitioner and certain of her companies against respondent, in course of trial in the Denver district court, having to do with

the same matters included in the original offer of proof. Respondent objected to the filing, but in view of the fact that the "amended" offer was based upon additional book and documentary evidence which was not available to petitioner in the disciplinary proceeding, we granted leave to file as requested. I am not advised as to what further occurred in the accounting case in relation to the particular matters comprehended in the further tender, but in this proceeding respondent has offered nothing in refutation or explanation thereof. It is so challenging, that fitly, I believe, it may not be ignored. Accordingly, I set it forth in extenso, as follows:

IN THE SUPREME COURT
OF THE
STATE OF COLORADO.

The People of the State of )
Colorado, upon the rela- )
tion of LoRaine Good )
Kent, )
 Petitioner, ) Amended Offer of Proof.
 )
No. 15749, )
 vs.
Wilbur F. Denious, )
 Respondent. )
 Harwin Apartments
 Doyle Loan
 29th and Champa.

Petitioner respectfully represents that in a private accounting action between LoRaine Good Kent, the Tivoli-Union Company, the Western Products Company, and The Fortuna Investment Company, Plaintiffs, and Wilbur F. Denious, Defendant, being Action No. A-49352 in Division 2 of the District Court of the City and County of Denver, trial was set by the Honorable Joseph J. Walsh for the 14th day of July, 1947; that on that day the defendant in that cause, respondent herein, produced

certain records, ledger sheets, communications, and documents in connection with transactions previously handled by him as attorney and trustee for the plaintiffs in that action;

That since said date these documents and records have been examined by accountants and counsel for the respective parties; that as a result of such examination facts were discovered which were not available to petitioner at the time of the original Offer of Proof (folios 1636-53) concerning wrongful acts of respondent in dealing with the Harwin Apartments, the Doyle loan, and 29th and Champa.

That the attorneys for LoRaine Good Kent in the accounting suit heretofore mentioned were designated by this Court to assist the Attorney General in the prosecution of the disbarment proceedings; that the said attorneys have called to the attention of the Attorney General the following additional information which was not available at the time of the original offer of evidence in connection with the above named properties;

That this additional information, limited herein to the properties involved in the original tender, is submitted herewith with the request that this Honorable Court consider the same as an amendment to the original offer of proof heretofore made.

H. Lawrence Hinkley,
Attorney General.

Duke W. Dunbar,
Deputy Attorney General.

James D. Geissinger,
Assistant Attorney General.

Ireland and Ireland,
By Clarence L. Ireland.

C. D. Bromley,

Attorneys for the Petitioner.

Amended Offer of Proof
re
Harwin Apartments
1566 Logan Street,
Denver, Colorado.

On September 4, 1930, Harry Weinstein, owner of the Harwin Apartments, located at 1566 Logan Street, Denver, Colorado, gave a first deed of trust covering this property to Harry W. Newcomb, as Trustee, to secure to the order of The Newcomb Realty Company the payment of a note in the principal sum of $45,000.00 due in three years, with interest at the rate of six per cent per annum, payable quarterly.

The books of the Western Products Company show that this loan was made by Mr. Denious, on September 4, 1930, from the proceeds of another loan in like amount, which had been paid to him for the account of Western.

By two warranty deeds, dated November 5, 1930, and December 6, 1930, the Harwin Apartments were conveyed by Harry Weinstein to George H. Green subject to said first deed of trust.

Interest payments due to June 4, 1933, were collected by Mr. Denious, were placed in his personal checking account in the Denver National Bank, and were in turn remitted to The Western Products Company by his personal checks drawn on that account.

Subsequent interest was not paid, and on November 16, 1933, H. R. Herian, who was Mr. Denious' secretary and who had no interest whatever in the loan, filed a lis pendens giving notice of an action brought by her, as owner of the note, to foreclose the deed of trust securing this note for $45,000.00.

Following this notice, as evidenced by documents produced by Mr. Denious, but not shown in the books or records of Western, an agreement was entered into, on or about November 23, 1933, between Mr. Denious and George A. Green under which (a) Green was to imme-

diately execute a special warranty deed conveying the property without exceptions other than taxes to H. R. Herian, Mr. Denious' secretary; (b) Green was to be paid $5,500.00 for his furniture and fixtures; and (c) Green was to have the November, 1933, net rents and an option to repurchase the property for the sum of $51,-843.70, plus interest at six per cent from December 1, 1933, if exercised before June 1, 1934.

In accordance with this agreement and instructions from Mr. Denious, the Western Products Company on November 28, 1933, issued its check for $5,500.00 payable to Wilbur F. Denious, which was noted on its ledger as "W.F.D. furn, loan—$5,500.00," and on its journal as "Weinstein/Green add'l. for furn.". On the same day Mr. Denious issued his check for this amount to George E. Green. A bill of sale was executed by Green to H. R. Herian, conveying the fixtures, furniture and equipment, and under date of November 24, 1933, George E. Green conveyed the Harwin Apartments, together with fixtures, furniture, and equipment located therein, to H. R. Herian by special warranty deed, which contained no exceptions against encumbrances other than taxes and which carried no revenue stamp. As of the date of this conveyance interest was delinquent in the sum of $1,-297.50.

The Green option to re-purchase was never exercised. Title to the property was never placed in the name of Western, and was at all times held in the names of "dummies," who had no interest whatever in the property.

The books of Western do not show the initiating of any foreclosure proceedings, do not show foreclosure expenses, nor do they show the subsequent acquisition of title to both real estate and fixtures in lieu of foreclosure. Throughout 1933 and until the books of this transaction were closed late in 1934, the books of The Western Products Company show only a continuing loan under the heading of "Notes Receivable."

A ledger sheet entitled "Harry Weinstein-George Green," produced from Mr. Denious' office records, provides information as to his subsequent receipts of revenue from this property. The books and records of The Western Products Company are wholly silent with respect to any of these receipts.

This ledger sheet for Denious' office shows that during the period from November 23, 1933, to October 3, 1934, Mr. Denious collected, and held in his personal bank account, rents from the Harwin Apartments as follows:

1934

| | |
|---|---|
| January 5 | $1,132.65 |
| February 8 | 861.06 |
| March 9 | 963.04 |
| April 10 | 962.23 |
| May 14 | 808.41 |
| June 8 | 621.22 |
| July 13 | 536.55 |
| August 6 | 800.23 |
| September 6 | 1,050.92 |
| October 4 | 519.04 |

Total rents received............$8,275.35

This same ledger sheet shows payments made by him from his own account during this period as follows:

1933

| | | |
|---|---|---|
| November 16 | Dkt. fee | $ 12.50 |
| November 16 | Shf. fee | 3.00 |
| November 17 | Rec. lispendens | .70 |
| December 2 | Pd. rec. w. d | .60 |
| December 4 | Abs. Clements | 8.00 |

1934

| | | |
|---|---|---|
| Jan. 10 | Abst. | 1.00 |
| Jan. 15 | ½—1932 taxes | 980.35 |
| Jan. 15 | Tunnels | 94.50 |
| Feb. 28 | ½ generals | 817.53 |
| Feb. 28 | ½ Tunnels | 47.60 |

| Mar. 1 | Personalty | 92.74 |
| July 31 | ½ generals | 817.53 |
| July 31 | ½ Tunnels | 47.60 |

Total expenditures............$2,923.65

To summarize, this ledger sheet shows:

Total *receipts* by Mr. Denious of........$8,275.35
Total *expenditures* by Mr. Denious of 2,923.65
Balance belonging to the Western Products Company but held by Mr. Denious in his personal account.................................................................$5,351.70

As to the above balance of $5,351.70, this same ledger sheet contains entries of the following purported payments to The Western Products Company:

| 1934 | | | |
|-------|----------|----|----------|
| 6.12 | W. Prod. | $ | 621.22 |
| 7/21 | " " | | 556.55 |
| 8/8 | " " | | 800.23 |
| 9/6 | " " | | 1,050.92 |
| 9/15 | Pd. Balance to W.P. Co. | | 1,803.74 |
| 10/10 | W.P. Co. | | 519.04 |

$5,351.70

These checks totalling $5,351.70 were never delivered to Western Products Company, and pencilled lines are drawn through each of the entries which refer to any payments to Western.

Among the records first produced from Mr. Denious' office on July 14, 1947, are the following numbered checks originally drawn and signed by Mr. Denious, but which were never delivered to Western and which, in each instance, have the signatures torn off.

| Check No. | Date | Payable | | | Amount | |
|-----------|---------|---------|--------|-----|--------|--------|
| 33629 | 6/12/34 | Western Products Co. | | | $ | 621.22 |
| 33800 | 7/21/34 | " | " | " | | 556.55 |
| 33888 | 8/ 9/34 | " | " | " | | 800.33 |

| 34034 | 9/ 7/34 | " | " | " | 1,050.92 |
| 34083 | 9/14/34 | " | " | " | 519.04 |

Total ........... $5,351.70

About the last of September or the first of October, 1934, Denious, without corporate authority from the Western Products Company and without entering any record of the transaction on either the company's minute book or its financial books or records, and also without the knowledge or consent of Mrs. Kent, the then beneficial owner of the corpus of the Trust and Estate, which in turn owner 87.2% of the Western stock, secretly entered into an agreement with himself as trustee to sell this property to himself and Newcomb for a purchase price of $46,000.00, less accrued taxes of $1,387.25, or for an adjusted purchase price of $44,612.75.

Whether or not Harry W. Newcomb knew of the trust character of the property at the time of this agreement has not yet been established.

The money for the purported purchase was to be raised as follows:

(a). The sum of $25,000.00 by reviving and selling to some outsider that much of the old Weinstein loan, which note and trust deed securing the same had already been extinguished by taking the deed to the property, without excepting encumbrances, from Green to Herian over a year before.

(b). The sum of $19,610.75—a $2.00 difference in favor of the partners—from H. W. Newcomb, of which amount Denious was to return half.

In addition to the purchase price Denious was to forward to Western his numbered checks totaling $5,351.70 referred to above.

A document evidencing this transaction was found among the records furnished by Mr. Denious for the first time on July 14, 1947, and reads as follows:

*Statement re 1566 Logan Street—October 11, 1934*

| | | |
|---|---|---|
| Purchase price | $46,000.00 | |
| Tax adjustment | 1,387.25 | $44,612.75 |
| Amount of present mortgage | | 25,000.00 |
| | | |
| Amount to be paid | | 19,610..... |
| One-half due from each | | 9805.37 |

WFD paid his half by

| | |
|---|---|
| Check No. 34146 | $9,800.00 |
| Cash to H. W. N. | 5.10 |
| | $9,805.10 |

| | |
|---|---|
| Purchase price | $46,000.00 |
| Credits re collection of rents | 5,351.80 |
| | $51,351.80 |
| Less adjustment on taxes | 1,397.25 |
| | $49,954.55 |
| Amount present mortgage | 25,000.00 |

Amount due Western Products Co.............$24,954.55

Following checks received re above amount
due..............................................................$24,954.55

Rental checks as follows

| | |
|---|---|
| WFD No. 34083 | $ 1,803.74 |
| 33629 | 621.22 |
| 33800 | 556.55 |
| 33888 | 800.33 |
| 34034 | 1,050.92 |
| 34170 | 519.04 |
| | $5,351.80 |

| | | |
|---|---|---|
| Check from Newcomb—10/3/34 | $19,610.05 | $24,962.45 |

Balance............$7.90

Of above balance, $7.00 is to be used to pay abstract bill.

On October 3, 1934, H. W. Newcomb gave his check to Denious for $19,610.75, whereupon Denious by check No. 34146, drawn on his Denver National Account—cashed on October 4th—repaid Newcomb $9,800...... Denious likewise paid an abstract bill for $7.00, and apparently gave Newcomb $5.10 in cash, leaving Denious 27¢ short in his accounting with Newcomb.

On October 17, 1934, under direction from Mr. Denious H. R. Herian gave a special warranty deed to the Beloit Company, a corporation without assets used by Newcomb and Denious, as a "dummy" company to hold titles to real estate, without consideration. This deed was made "subject to encumbrance" and carried revenue stamps of $7.50.

At least six weeks before November 27, 1934, the Denver National Company, successor to Van Schaack & Company, Denver real estate brokers, initiated negotiations for the sale of the Harwin Apartments to L. H. Guldman, and said apartments were formally listed for sale with said real estate brokers on or about October 27, 1934, for $65,000.00.

On November 23, 1934, Denious sold a $25,000.00 face of the original Weinstein loan to D. W. Bradford for $25,000.00 plus "accumulated interest" in the sum of $220.84. In remitting the proceeds of this transaction to Western, Denious deducted a commission of $500.00, and instead of remitting the $25,220.84, remitted only $24,-720.84.

Denious and Newcomb collected, and did not remit to Western, net rents for October, 1934, in the sum of $1,-208.13 and net rents for November, 1934, in the sum of $1,219.83.

On November 27, 1934, a month and ten days after the deed was given from Herian to Beloit, the property was sold through the agency of the Denver National Company to L. H. Guldman for $65,000.00 cash.

As a result, in addition to the accumulated rents already received up to October 4, 1934, amounting to $5,-

351.70, in addition to the October, 1934, rents of $1,208.13, in addition to the November, 1934, rents of $1,219.83, and in addition to. the proceeds of the sale of the note to Bradford in the sum of $25,220.84, Denious and Newcomb received in cash from Guldman the sum of $35,-573.45—a total amount received by Denious and by Denious and Newcomb of $68,573.95, summarized as follows:

Net rents from November 24, 1933
to October 4, 1934................................$ 5,351.70
Net rents for October, 1934.................... 1,208.13
Net rents for November, 1934................ 1,219.83
Proceeds of sale of note to Bradford.... 25,220.84
Proceeds of sale to Guldman................ 35,573.45
 Total cash received by Denious and
 by Denious and Newcomb......................$68,573.95

Of this sum Denious paid to Western only the following amounts:

September 26, 1934...................................$10,000.00
October 1, 1934......................................... 5,000.00
October 8, 1934......................................... 9,954.55
November 24, 1934................................... 24,720.84
 Total paid to Western...............................$49,675.39

Thus, as a result of the Denious plan, Denious and Denious and Newcomb received:

A total of..................................................$68,573.95
 and
Paid to Western only.................................. 49,675.39
Leaving a balance belonging
to Western and retained by
Denious and Newcomb of........................$18,898.56

Furthermore, for the purpose of reimbursing D. W. Bradford for the use of his money from November 23, 1934, until he was repaid by Guldman on November 27, 1934, Denious deducted from the gross Guldman sales price a bonus to Bradford of $250.00, and also, as a part

of the sale, paid Bradford net interest in the further sum of $12.41, an additional loss to Western.

In addition to the above amounts, Newcomb Realty Company also retained from the proceeds of the sale the sum of $1,250.00, representing one-half of the total sales commission.

None of these transactions appear on the books or among the records of the Western Products Company. The books of his clients do not show the rents received from November, 1933, to November, 1934; they do not show the acquisition of title by the Green deed given in lieu of foreclosure; they do not report the Guldman sale nor do they show the proceeds therefrom.

Western books do not show the sum of $68,573.95 collected by Denious and by Denious and Newcomb; they do not show the expenditures of $262.51 to Bradford; and they do not show the $18,898.36 withheld from Western for the profit of Denious and his partner.

Finally, in accordance with his plan, Denious closed the books of Western by entries showing only the following:

| | |
|---|---:|
| Loan | $45,000.00 |
| Furniture loan | 5,500.00 |
| | $50,500.00 |
| Total payments received on account of this investment | 49,675.39 |
| And ending with a loss charged to P. & L. of | $ 824.61 |

The following copy of a document first produced by Denious on July 3d, 1947, gives his own estimate of the personal profits derived by him from the violation of his trust obligations:

Harwin Apartments—1566 Logan Street
Purchased 10/2/34 $9,800.00
 5.10
 7.50
 .60

 $ 9,813.20
Sold 11/30/34 $17,521.48

 Profit.............$ 7,708.28
Rent received during period of ownership........$ 638.22

During all this period, Denious was attorney for Western Products Company, and after the death of John E. Good, in August, 1931, Denious was acting as attorney and trustee for all the Good interests which owned 87.2% of the Company's stock.

---

Amended Offer of Proof re Doyle Loan
671 Logan Street, Denver, Colorado.

On April 28, 1930, James N. Doyle owned a garage building at 671 Logan, on which there was an encumbrance for the principal sum of $13,000.00. He was also the owner of an unencumbered residence property at 24 Acoma Street, Denver.

On that date he conveyed both of these properties, subject to the prior deed of trust on 671 Logan Street, to the Public Trustee to secure to H. Moore, payment of two notes, aggregating $5,500.00, due in one year, with interest at six per cent per annum. These notes, with accompanying security, were acquired by the John Good Trust, through the agency of Mr. Denious, shortly following the death of John E. Good in 1931.

Interest was paid until January 28, 1932, but was not paid thereafter, and on May 3, 1932, in lieu of foreclosure, James N. Doyle gave two quitclaim deeds, each conveying one of the above described properties to the Niles Company, a corporation without assets, maintained by the Newcomb Realty Company as a vehicle to take

and hold titles to property for the benefit of Newcomb, Denious, and others. Both deeds were recorded May 5, 1932, on successive pages of the Denver County records.

Niles Company had no interest whatsoever in the original loan nor in the properties above described, and was merely a "dummy" holder of title.

On May 5, 1932, Niles Company executed two warranty deeds conveying these properties, subject to all encumbrances of record to the Beloit Company, which likewise was a "dummy" corporation, having no interest in either property. These two warranty deeds were recorded June 10, 1932, on successive pages of the Denver County records.

The books of the John Good Trust show this transaction as a continuing loan until December 31, 1933, at which time the property at 24 Acoma Street was set up on the trust books as real estate, valued at $3,500.00 plus expense owed to Newcomb Realty Company of $337.14, or at an adjusted valuation of $3,837.14. Deducted from this figure was depreciation at the rate of five per cent on $3,237.14—the building valuation—for the year 1933.

The books do not mention the deed to 671 Logan, which was taken in lieu of foreclosure, and are wholly silent with respect to that property or to ownership by the Trust subject to the prior encumbrances.

Among the records produced by Mr. Denious for the first time on July 14, 1947, were two ledger sheets showing the receipt by Mr. Denious of rents on 671 Logan, commencing on December 9, 1931, and continuing until June 6, 1940. These ledger sheets show that on December 9, 1931, Denious collected net rent in the sum of $200.00; also that in one year 1932 he received rents in the sum of $850.51, and expended, for interest on the first deed of trust and for other expenses, the total sum of $590.20, leaving a net balance in his hands for the period from December 9, 1931, to December 31, 1932, of $452.31.

No accounting and no reference with respect to these receipts appear on the books of the Trust.

On December 2, 1935, the Beloit Company conveyed the property at 24 Acoma Street, without exceptions and without revenue stamps to the Erie Investment Company, a corporation organized by Denious to hold properties belonging to the Trust.

On March 17, 1936, the property at 24 Acoma Street was was sold and conveyed by the Erie Investment Company for a net purchase price of $3,198.78, and the books of the Trust in connection with the entire Doyle transaction were closed by a book loss charged to P. & L. of $204.50. This loss was computed by Denious upon the basis of an original investment of only $3,500.00 instead of the $5,500.00 paid by the Trust. The loss in fact was $2,204.50.

Mr. Denious, on March 18, 1936, caused H. Moore of his office, as the purported holder of the indebtedness secured by the original deed of trust for $5,500.00, to request the Public Trustee to release the trust deed, not only on 24 Acoma Street, but also on 671 Logan. Accordingly as to both properties, H. Moore, who had no interest in either the indebtedness or the properties was directed to and did state to the Public Trustee as follows:

"Please execute this release, the indebtedness secured by the above mentioned deed of trust having been fully paid."

Mr. Denious continued to collect rents from 671 Logan Street, and after paying all expenses, including taxes and interest on the first loan, retained the surplus, which for the period from December 9, 1931, to June 6, 1940, amounted to $1,577.44.

The books of the Trust reflect none of these receipts, nor do the books show this profit which was not remitted to the Trust.

One thousand dollars of this profit of $1,577.44 was used to reduce the principal on the first deed of trust,

which, after the date of payment of this amount on March 7, 1940, amounted to $12,000.00.

The remaining balance of $577.44 was transferred in June of 1940 to a new ledger in accordance with a notation on the loan card kept in the files. "W.F.D. owns."

On March 12, 1941, this balance of $577.44 was withdrawn from his so-called trust account in the First National Bank by means of his check No. 3642, made payable to himself, and this amount was in turn deposited to his account in the Denver National Bank. His check stub stated "Bal. 671 Logan Acct."

On June 1, 1940, Mr. Denious caused the Beloit Company to convey 671 Logan to the Neosho Company, a corporation which was and is wholly owned by him.

During the period from June 1, 1940, to September 1, 1947, the net rents received by Denious over and above all expenses, including taxes and interest, amounted to $9,489.68, which he neither remitted nor reported to Western Products Company.

On January 1, 1941, Denious issued his Check No. 41136 drawn on the Denver National Bank, and payable to Wilbur F. Denious, for $12,035.33, noted as Doyle principal and interest. He deposited this check in his First National Bank Account and on the same day issued Check No. 3352 drawn on that bank to pay this sum to the holder of the first deed of trust on 671 Logan Street. Since that date the property has been clear in Neosho.

The property at 671 Logan was appraised by Eugene H. Ambrose, realtor of Denver, on or about May 1, 1947, as being of the current cash value of $38,000.00.

In addition to all this, on April 19, 1932, Denious acquired by his own check a certificate of tax sale covering the 1930 general taxes on 671 Logan, and paid therefor the sum of $623.31.

This certificate was purchased from an outside buyer and was not redeemed but was held by Denious, personally, although the Trust had funds to itself effect the redemption.

He did not charge the amount of $623.31 to his ledger rent account, but on August 16, 1934, issued a check on the Denver National Bank for $833.10, payable to the Treasurer, in redemption of those taxes, and charged this amount—not the $623.31—to his ledger. Immediately thereafter, he collected the $833.10 from the Treasurer and left the account charged with a sum of $207.79 more than the original amount paid.

Also during the period from 1932 to 1938 he expended on account of taxes, the total sum of $2,423.10, which included the $623.31. He did not charge the items making up this amount to his rent ledger, but on account of these same taxes he received back from the rent account and charged on his ledger the total sum of $2,833.10, an excess of $410.00 above the true amount which should have been charged.

To summarize, he has collected, and he has neither reported nor remitted to the Trust the following net profits from this transaction:

Excess rents from December 9, 1931, to June 6, 1940 ..............................................................$ 1,577.44
Excess taxes collected.................................................. 410.00
Net rents—June 6, 1940, to September 1, 1947.. 9,489.68

Total withheld............$11,477.12

In addition, he still holds title to the property, which had an equity of $25,000.00 above the former encumbrance, and has left his client, the Trust, with its loss on this transaction amounting to $2,204.50.

Amended Offer of Proof re Property at
29th and Champa.

The records presented on July 14, 1947, with respect to this property disclose no alteration from the original tender except that the amount of net rents collected and retained by Mr. Denious over and above expenses for the period November 1, 1931, to April 13, 1939, is $253.12 instead of $450.00, as stated in our original tender.

The first charge considered by the referee has to do with respondent's purchase of the minority holding of the estate of the late William Burghardt in the brewing companies, about 12½% thereof, the remainder of which petitioner already was the owner. To make this purchase, the sum of $39,250 was required. Respondent advised petitioner to purchase it, but at the same time emphasized her lack of funds with which to make the purchase. He did not advise her to use her credit, which her more than a million dollars worth of clear assets amply would have enabled her to do. Instead, respondent suggested that he would buy it for her, she to enjoy the right to buy it back at her option, at the price he paid therefor. In August, 1938, respondent did purchase the Burghardt stock. From that date until November, 1945, when petitioner exercised her option to take the stock, respondent received dividends thereon at the rate of from twelve to eighteen per cent., dividends that he, not she, declared, in sums as follows: 1938, $2,057.15; 1939, $4,428.00; 1940, $5,519.00; 1941, $5,049.00; 1942, $5,-175.90; 1943, $6,345.00; 1944, $6,102.00; 1945, $7,397.62; totaling $41,873.67. Had respondent advised his client to borrow the required money, to be had for the asking, and at 4%, which appeared to be the current rate, it would have cost her to carry the loan for the full time respondent owned the stock, something in excess of $11,-000, or approximately $30,000 less than it cost her under respondent's plan. The transaction imports an unconscionable exaction from petitioner in the interest of respondent, into whose keeping his client had committed her entire fortune. But that is not the whole revelation. To buy the Burghardt stock, petitioner did not need to borrow money. At the time respondent made the purchase, justified on the theory, of which he adroitly convinced petitioner, that she was not in position to buy it, he had in hand for her an overdue promissory note on which there remained an unpaid balance of $66,-500.00. This note not only was amply secured on real

estate, but the obligors were wealthy business men, who, if required to do so, could, and would, pay any such sum at once. These debtors also were clients of respondent, who admits he did not demand payment of them, nor did he advise petitioner of that cashable resource. Why should respondent have favored these debtor clients of his, as against petitioner, another client to whom the favored ones were indebted? According to the advice he had given petitioner, it was imperative that she expend a sum approximating $40,000.00 in the interest of acquiring the Burghardt stock. She was in agreement with her lawyer, but the question with petitioner was, Whence the necessary funds? Her lawyer, having exclusive possession of all the evidences of her material holdings, real, personal or mixed, advised her that the solution most feasible was the one which already we have discussed, and out of which respondent reaped inordinate profits, at the expense of a client who trusted him implicitly. I am not in agreement with the referee that in what respondent advised and did in relation to the charge under consideration, he was acting in petitioner's interest, or was moved by proper motives, or doing other than taking advantage of a client, to his own enrichment. Although, seemingly, respondent bought the stock in the interest of petitioner, his every act indicated he bought it for himself. Having the legal authority to do so, he started immediately to declare dividends on the stock, as the result of which in seven years he had received in dividends the sum he had paid for the stock, plus more than two thousand dollars, and still owned the stock. Now I examine the concluding chapter of the story of the overdue note respondent neglected to collect for his client in 1938, which, if done, would have saved for her the more than forty thousand dollars in dividends which respondent's stewardship operated to transfer to his own account. Under date of September 16, 1944, respondent wrote petitioner a letter in relation thereto, reading as follows:

September 16, 1944

Mrs. LoRaine G. Kent,
300 Park Avenue,
New York, N. Y.

Dear LoRaine:

I have been away about a week and on my return I have a surprise to give you. We have been carrying in the assets of the Good Estate a note, like the Heitler note, which I feared we might never be able to collect, although I have been collecting interest on it. The owners of the property have also made partial payments on the principal from time to time and finally got it down to about $40,000.00. Before I left Denver I had some intimation that it might be paid, and I left instructions that in case it was paid to send $15,000.00 to the West Palm Beach National Bank to pay the mortgage and apply the balance to the notes at the First National Bank in Denver. Strange to say, the note was paid * * *. I am glad to get rid of that mortgage at Palm Beach because it was drawing 6%, which is too high for these times and particularly in view of the good security they had. With this reduction on your loans we can continue to deposit to your account the $3,000.00 a month if you need it, although that may necessitate borrowing some more in Denver to pay the last installment on the income tax return.

Having just returned I am very busy, but I wanted to give you the above information and will write you again next week.

> With kind regards, I am
>
> Sincerely yours,

WFD mr

Wilbur F. Denious.

For consideration of the letter I note the following: (1) That respondent did not reveal that the note, besides being secured on real estate, long years before had been

assumed by men that respondent admitted in this inquiry, made it good beyond question, hence, his "fear" of collecting it was so much deceit; (2) that the sum paid to respondent, $40,000, was a few hundred dollars in excess of the sum required to pay him back the money he had paid for the Burghardt stock, and which, from time to time in his testimony, as he enlarged upon his *careful stewardship,* he urged her to save and pay, so that, as he said, she would not be "indebted to her lawyer;" (3) that the payment was a "surprise" to him, and of course, since he had not advised petitioner of the note, the collection was not of funds the disposition of which she had made plans; (4) that he assumed he had authority to disburse the large sum in his client's interest, and acted thereon; (5) that at the time thereof, she owed $15,000, secured by mortgage on real estate that she had purchased in Florida, bearing 6%, notes at the First National Bank, Denver, bearing, probably, 4% interest, and $40,000 approximately, to respondent, on which he was collecting 18% in dividends; (6) that he was keen to apprehend and emphasize to his confiding client that the Florida bank was charging 6%, "too high," he said, "for these times;" (7) that "carefully" surveying the items of his client's obligations, and without advising her at all, concluded that it was to her interest to pay the six per cent loan in full, or $15,000, and $25,000 on account of the four per cent obligation, neither of which was pressing, rather than the one on which he himself was drawing interest (dividends) at 18%, and promptly acted thereon. I cannot think that had a third bank, or other third party, held the eighteen per cent obligation, respondent would have paid the six and four per cent loans instead of the usurious one. "While an attorney is under no incapacity to deal with his client, all such transactions are subject to suspicion and close scrutiny, and will be sustained only where they are characterized by the utmost fairness and honesty and the attorney clearly shows that no undue influence was exercised and that the client received the same benefits and advantages as

if he had been dealing with a stranger." 7 C.J.S., p. 964, §127. I call attention to the fact that the referee ignored the large due and unpaid note, and the item of forty thousand dollars collected thereon in 1944, and the disposition thereof by respondent. In the matter of the charge under consideration, I cannot think that respondent was a faithful steward, or that he wrought other than in his own interest.

The next charge has to do with respondent's purchase of additional stock in the Brewery. It is of pattern of the purchase in 1938, already discussed. It appears that in April, 1945, petitioner had issued postdated checks on the Denver bank for sums aggregating an amount in excess of $18,000, which she wished to protect by depositing funds to cover. She communicated with respondent, her lawyer, and manual possessor, manager and controller of all her material holdings, fully stating the situation, and asked him to arrange to deposit the required amount in the bank, by borrowing at the bank, or selling or mortgaging some of her holdings. Although at various times she borrowed money from the Denver bank on which she had drawn the checks referred to, in amounts such as $86,000, $60,000, and other, at the time in question she was not indebted to it in any sum. Whatever the sums were which she borrowed from time to time she was not required to give security, not surprising, for there never was a time through the years when her clear and tangible assets were of less value than in excess of one million dollars, and at the time she wished to borrow to cover her postdated checks, her assets were of value of one and one-third million dollars, or more, with all of which, of course, the bank was fully conversant. Notwithstanding all the foregoing, respondent discounted the idea of selling any of her properties; explained the burdens and difficulties of income tax adjustments in relation thereto, and that the bank would not make the loan. But he bade her be of good cheer— he would work out a plan, which presently he formu-

lated and forwarded to her. The *plan:* He would buy more brewery stock at the price at which he bought it in 1938 (about one-third its book value in 1945), pay down $19,875, and a like sum per annum until he should be the owner of one half of the entire stock issue, provided of course, she could buy it back at the price he paid, as was the arrangement in relation to the Burghardt holding, already discussed. To this evident unconscionable suggestion from respondent, her trusted lawyer and confidant, petitioner still wondering why the bank would not loan her $20,000, or why her lawyer, in addition to buying enough of her stock to cover the sum needed, was requiring her to option other stock over a period of years, and for the same low price, for more than she was needing, and worrying no end, replied to her advisor: "I am on the spot and there is nothing I can do. If you have no other place to get it, I will do as you say, but at least $20,000 must be in at once. We won't wait to sign papers. I know so little about the stock of Tivoli. How much is it worth a share? * * * I trust you and hope I always will. When I come in June I will talk things over again with you, but be sure to cover checks coming through." Thus respondent drove a hard bargain with his client. But, having accomplished it, Did he promptly pay the $20,000 into the bank for her account and for the purpose of protecting her there? No. He withheld the deposit until June 28, 1945, and the bank paid her checks and carried the amounts as overdrafts. Also, and promptly, respondent included this new purchase in the dividend drawing status for 1945, realizing thereon, almost immediately, the sum of $2,686.81. The book value of the stock for which he paid $19,875 in 1945, was $51,000. Considering that $20,000 was the extent of petitioner's immediate need in April, 1945, respondent might, reasonably, I think, have thought of the cash position of the Tivoli Union Company, and the several entities having to do with the Brewery Company, and worked a major saving to his client by getting the

money from that source. The Tivoli Company proper had cash in the sum of $43,887.53; the branch plant at Grand Junction, $12,726.41; the Western Products, $8,-135.92; the Fortuna, $2,774.08; the John Good bank account, $2,701.56; the LoRaine Kent account, $1,124.03, or a total of $71,249.26 in cash. In addition, the company had liquid securities amounting to $58,000 in United States Government bonds; and Western Products, $25,-000 of said bonds. Regardless of the foregoing, and how it may be regarded, the fact remains that the simple, provident and economical course would have been to borrow $20,000 from the bank, on which the service charge would have been low, likely 4%. That method involved no income tax problem. Also, it is what petitioner herself urged upon the attention of her lawyer. But he did not wish to pursue that course, and to avoid it refrained from even asking the bank for such a loan. The inescapable deduction is that respondent took advantage of an unfortunate situation in which his client suddenly found herself, bought enough of her stock to meet it at one-third its value, immediately took a heavy dividend thereon, and contracted to get many other such interests over a series of years at the same low price. I cannot think he acted in good faith, or other than in his own interest.

I come now to the charge involving the camouflaged and wholly secret conveyance to respondent, of certain properties held by two of petitioner's corporations, namely, 116-20 Broadway, Denver, standing in the name of the Western Products Company, and 2071-75 Broadway, Denver, in the Fortuna Investment Company. These two properties had been so held for several years. The directors of these corporations, as was the case in relation to her other corporations, all as we have seen, were respondent and lawyers in his office, the latter disclaiming any direct knowledge concerning the business and affairs thereof, and respondent was president of all the corporations.

It appears that July 9, 1945, Van Schaack & Co., submitted an offer in writing of $20,000 for the 116-20 Broadway property. Respondent took the matter up with the manager of the brewery properties, but in doing so, reported that the offer was for $15,000. The manager looked at the brewery's books, and told respondent the offer would not enable the company to come out even, etc. Respondent then said to the manager, in effect, that Van Schaack & Co. will inquire further about the property, so what price shall we fix on it. The manager said, "tell them the property is not for sale at all." Thereafter, although there were inquiries as respondent testified, his invariable answer was, "the property is not for sale." It is fair to say that respondent insists that the original offer was $15,000, but the evidence from disinterested witnesses is that the offer was $20,000, and since the offer was a written one, it is clear that respondent did not properly report the offer to the brewery manager. Besides, as it seems pertinent to observe, respondent, not the brewery manager, was petitioner's lawyer and responsible for his stewardship of her properties. But that is not all. July 20, 1945, the Van Schaack Co. made another offer, in writing this time for $25,000 for the same property, 116-20 Broadway. Respondent denies seeing this last offer, or of knowing thereof. The evidence supporting the fact of the offer is overwhelming, the Van Schaack agent and the prospective purchaser both testified to the fact thereof. In addition, the agent testified that he told respondent over the phone that he believed his client would pay $30,000 for the property, to which respondent, as the agent further testified, replied, "the property is not for sale." Respondent testified that, "to the best of my recollection," the only offer I ever knew of, was the one for $15,000. "I have no recollection whatsoever of ever having seen or heard of the two offers contained in Exhibits A. and B.," which are the $20,000 and $25,000 offers Van Schaack's representatives say they communicated to re-

spondent's office. The Van Schaack company, generally, and the representatives thereof involved in particular, were in frequent communication with respondent's office, and among them all amity and friendship obtained. Respondent, although in some measure testifying contrary to their evidence based generally on "no recollection," and in relation to which on cross-examination he admitted that he could think of no reason why these witnesses should state other than the truth. Shortly after the conversation between respondent and the brewery manager (an employee, as it is proper to observe, who was employed by respondent, and was beholden only to him) when they agreed to say to all comers, "the property is not for sale," respondent went again to the brewery, and as the referee found: "Mr. Haynes [the manager] told Mr. Denious [respondent] that if $25,000 could be obtained for the properties 116-20 and 2071-75 Broadway [the former being the one for which Van Schaack had been submitting offers] he would be willing to sell them because the money could be used to better advantage by the brewery than could the properties; Mr. Denious stated that he thought they might be sold for that amount and that he would see what he could do; that Mr. Haynes then suggested that he, Denious, buy the properties and when Mr. Denious stated that he could not well do so because of his position in the companies and because Mrs. Kent might object, Mr. Haynes suggested that he buy the properties subject to Mrs. Kent's approval and, if she objected, he could deed them back; that Mr. Denious decided to take the properties and thereafter and on August 11, 1945, as president of the two companies, he executed and acknowledged deeds of conveyance of the properties to J. F. McNaul, Jr., and on about said date sent a cashier's check down to the brewery for the purchase price, $25,-000, which was entered on August 14 on the books of Tivoli-Union to the credit of a suspense account and on August 25 transferred $15,000 to the books of the West-

ern Products Company and $10,000 to the books of Fortuna Investment Company, upon advice from Mr. Denious' office. That on September 11, 1945, J. F. McNaul, Jr., executed and acknowledged deeds of conveyance conveying these two properties to the Neosho Investment Company [respondent's company] and that all four deeds were recorded * * * on September 20, 1945, and bear consecutive reception numbers.

"The Referee finds that McNaul at no time had or claimed any interest in either of said properties and. acted only as an intermediary, permitting his name to be used so that the title to the properties of the companies of which Mr. Denious was the president might pass through him, McNaul, to the company of which Mr. Denious was the sole owner. That Mr. Denious gave general direction to effect the sale and transfer of said properties from the Tivoli Companies to the Neosho company for a consideration of $25,000 and that the preparation of deeds, settlement sheets, Board minutes and all of the details and mechanics of the transactions were entrusted by Mr. Denious to Mr. Tull or other members of Mr. Denious' office.

"That Mr. Denious had never listed either of these properties for sale with Van Schaack & Company or with anyone else, neither had any one by his authority or with his knowledge listed them. By whom, if any one, they were listed, does not appear from the evidence. That Mr. Roy E. Walker of Van Schaack & Company had received two written offers for the property at No. 116-22 Broadway (Pet. Ex. GG for $20,000 and Pet. Ex. HH for $25,000) can hardly be denied; that probably one of these offers was left at Mr. Denious' office by Mr. Trace about the time it was received by Van Schaack & Company and, if so, Mr. Denious never saw it; that at or about this time Mr. Trace mentioned the sum of $15,000 for the 116-22 Broadway property. As to which of said offers were left at Mr. Denious' office, the testi-

mony of Mr. Trace and Mr. Walker is in hopeless conflict.

"The Referee finds that $25,000 in cash was of greater use to the Tivoli than were these properties; that Mr. Denious did not attempt to realize a greater sum for them, that he did not 'follow up' the offer he had received from Mr. Trace nor did he have the properties appraised before buying the properties himself.

"The Referee finds that the fact that Mr. Denious did not have the properties appraised, did not list them for sale or follow up the offer received from Mr. Trace, and sold the properties to himself when a greater price might have been paid by a stranger are not important if Mr. Denious bought the properties *subject to Mrs. Kent's approval.* It would be of prime importance, however, for Mr. Denious to inform Mrs. Kent of the existence of such offer, of what he considered the properties actually worth and to give her all the information that he possessed and to have suggested appraisals and independent inquiry and investigation by her before *accepting her approval* of the transfers. Mrs. Kent's early objection to the transfers obviated the giving of such information and suggestions. Neither is it important that Mr. Denious expected to make a profit on the transaction—it may be assumed that he did and that Mrs. Kent would also assume it—for Mrs. Kent, when fully advised of all the facts and acquainted with values, might well consent because of Mr. Denious' long and faithful service to the Good interests and, as he at least thought, to her, inasmuch as the Tivoli companies had received the amount of their original investments, had lost nothing, and only waived a possible profit on the properties. (Referee's italics.)

"As to concealment and failure to advise Mrs. Kent of the transaction as bearing on the question of motive and intent, the Referee finds that at the time of the transaction Mrs. Kent was in New York City; that she had advised Mr. Denious at various times that she would

be in Denver during the summer of 1945; that Mr. Denious did not, by letter or otherwise, advise Mrs. Kent in New York of the transfer either before or after they were completed, neither did he consult Mrs. Kent and obtain her approval before making the transfers. Prudence would seem to require that he should have done so, and Mr. Denious in answer to a question on cross-examination, 'Why couldn't it wait until after you had consulted Mrs. Kent?' replied, 'Well, I think it could, and I wish it had. I think it was a mistake not to wait.'

"The Referee finds that Mrs. Kent while still in New York learned of the transfer of the Broadway properties through an anonymous telephone call; that upon arriving in Denver about the middle of October she checked the information, found that deeds of conveyance had been placed on record (Pet. Ex. P. Q. R. and S.), and after conferring with Mr. Ireland called Mr. Denious by phone and advised him of her arrival in Denver. A day or two later Mrs. Kent called on Mr. Denious at his office and complained that she had not received a statement for over six months and inquired whether any of her properties had been sold without consulting her, and when advised by Mr. Denious that none had been sold, told Mr. Denious that she had been advised that he had secured from her control of the Tivoli company and that she wanted a list of her Denver holdings so that, 'I will know what I own.' Mr. Denious called the auditing firm of Ernst & Ernst while Mrs. Kent was still present and arranged that such statement and inventory be prepared, and in a day or so they were delivered to Mrs. Kent (Pet. Ex. D and E). Either on this occasion or a day or so later Mrs. Kent told Mr. Denious that she was going to have an audit made and handed Mr. Denious Mr. Alexander J. Lindsay's card and requested Mr. Denious to call him up. Mr. Denious called Mr. Lindsay by phone and arranged for a meeting the next day at eleven o'clock. Mrs. Kent and Mr. Lindsay came to the office the next day and details of the audit were dis-

cussed and the audit began within a day or so, which audit was to include the business and properties of both the Erie company and the Tivoli companies. After the audit had progressed some two weeks and in the early part of November, 1945, Mrs. Kent and Mr. Lindsay came to Mr. Denious' office. Mrs. Kent opened the conference with, 'Wilbur, you should not have made me sell you that Tivoli stock last spring.' Both parties became very angry. Mrs. Kent then asked Mr. Denious whether he had sold any of her properties since 1931. Mr. Denious said, 'No' and then qualified by mentioning the Ayres Hotel. Mr. Denious was then asked specifically about the 116 and 2071 Broadway properties and he admitted the sale of both of these properties stating that they were not HER properties but belonged to the Tivoli companies. When told that the records of the Western and Fortuna companies show that the properties had been transferred to the Neosho Investment Company and asked if that was not his company, Mr. Denious said, 'Yes, that is my company but I don't think these properties stand in the name of Neosho Investment Company; I think they stand in the name of McNaul.' The Referee finds that this is the first time these properties had been mentioned or referred to by Mr. Denious or by any one in his presence since Mrs. Kent's arrival in Denver, and at this meeting Mr. Denious admitted the sale and offered to convey the property back. The Referee finds that Mr. Denious did not state that he had not sold the properties or if they had been sold he did not know it. Such statements would hardly be made in the presence of an auditor who had been on the books a couple of weeks or so. However, the Referee does find that Mr. Denious was evasive and that his answers and statements were not clear-cut and straightforward or such as should have been made under the circumstances. Admitting that they were technically correct—that he did not know that the properties had actually been conveyed by McNaul and the deeds recorded, such details

having been left to Mr. Tull—Mr. Denious knew that the Neosho company was to have the title and he should have assumed that done which he had contemplated and directed to be done. Mr. Denious' statements and conduct, while tending to show an intent to conceal the true nature of the transaction, may be accounted for by the tenseness of the situation, the charges of unfair dealings which had just been made by Mrs. Kent, the unfair advantage which he believed she was taking of him * * *. (Referee's caps.)

"The Referee finds that there was no concealment or attempt to conceal by the way the transaction was handled in Denver. The financial records of the companies show a sale to Denious; the Board minutes show a sale to McNaul, a well known real estate broker of Denver, the reason for such showing being explained by the evidence; the deeds show the correct consideration paid; the deeds were tendered for record simultaneously and bear consecutive reception numbers; and the fact that the Neosho company was owned by Mr. Denious was known by Mrs. Kent, McNaul, Tull, Haynes and many others. A most cursory examination of the books of the Tivoli companies, inspection of the public records, and inquiry, would disclose the sale, the consideration paid and that Mr. Denious had in reality become the purchaser.

"The Referee, therefore, finds that in buying said properties and in directing and causing the conveyance of these properties to be made by the Western Products Company and the Fortuna Investment Company to the Neosho Investment Company, Mr. Denious acted in good faith and with the intention of fully disclosing the transaction to Mrs. Kent, and if the same did not meet with her approval to cause the properties to be conveyed back to the respective companies."

Notwithstanding the referee concludes his review on this charge by stating that "respondent is not guilty" from the text of his findings it appears, inter alia, that

while respondent testified that the only offer he remembered receiving for the 116-22 Broadway properties was $15,000, the claim that there were two offers therefor, $20,000 by one customer, $25,000 by another, each evidenced by an exhibit pleaded and received in evidence, "can hardly be denied." In connection therewith, as the referee correctly determined, it was of "prime importance * * * for Mr. Denious to inform Mrs. Kent of the existence of such offer, of what he considered the properties actually worth and to give her all the information•that he possessed and to have suggested appraisals and independent inquiry and investigation by her before *accepting her approval* of the transfers." Respondent did none of these things. Instead, he withheld from his client the information that any offer had been submitted, advised the offerer that the property was not for sale, which he emphasized to the discouragement of other prospective purchasers, grouped the property for which the offer had been made, worth not less than $30,000, as the evidence showed, with another property shown by testimony to be worth not less than $22,000, and on his own responsibility fixed a price of $25,000 for both properties, and proceeding without the consent, indeed, without the knowledge, of his client, caused them to be conveyed to a corporation wholly owned by himself. It is ridiculous to claim that an attorney, proceeding circuitously and secretly, as here, who has so far forgotten the simple ethics of his profession as to consider taking conveyance of his client's properties in any event, in fixing the price he should pay, was justified in discouraging other offers, ignoring values, and overlooking all safeguards pertaining to such matters, may stand absolved. In connection with the value of these two properties, the Attorney General and petitioner's counsel asserted in their opening brief, that, "(These properties have since been sold by the petitioner for a total sum of $63,000, thus showing that the appraisal by Mr. Walker and Mr. Ambrose were extremely conservative.)" Respondent's

counsel, although they submitted a long brief, neither objected thereto nor offered refutation.

Although the referee finds that the $25,000 which respondent paid was worth more to the brewery company than the property would have been, the answer is twofold: (1) There was no showing that the brewery company was in need of money, and its cash balances disclosed by the record already stated in this opinion, manifest the contrary; (2) that assuming it needed money, Why should respondent deem it good stewardship to accept $25,000 rather than what the property was worth, $52,000, as was established, or $63,000, for which, as soon as petitioner dispensed with respondent's services, and asserted her authority as owner, the property seems to have been sold? For respondent to have sold the properties to whomsoever, and under whatever circumstances, for $25,000, would have constituted rare false stewardship, and to sell it to himself for that sum is inconsistent with every canon of ethics recognized by the legal profession.

The referee said in the beginning of one of the paragraphs of his findings, that, if respondent "sold the properties to himself when a greater price might have been paid by a stranger is not important if Mr. Denious bought the properties *subject to Mrs. Kent's approval."* Who advised respondent to follow that course? The brewery manager. And only that worthy and respondent, both on petitioner's pay roll, were permitted to consider the matter. At the first suggestion of such course respondent instinctively recognized the evil thereof, and immediately ruled it out. But he continued to listen to his employee, and shortly capitulated. Why would respondent, experienced, no longer young, capable above many, yield to any such suggestion. He, not the brewery manager, was at the controls. In the same paragraph, a portion of which already I have emphasized in this opinion, there is an answer to the portion quoted here. Re-

spondent, as the referee said, was bound to apprise petitioner of offers, ascertain and advise of values, etc. When? The referee said he should have done so "before *accepting her approval* of the transfers."

At no time, although respondent often communicated with petitioner, did he advise her of the transaction involved. Before coming to Denver, however, petitioner was apprised by a prominent Denver real estate operator, who called on her in New York, of the conveyances involved here. On independent inquiry, she verified the story. On her return to Denver, she went to respondent's office and asked whether he had sold any of her properties, and received a negative reply. She then asked to be advised in detail as to her properties. She went to his office three additional times, and as on the first occasion, inquired whether he had transferred any of her properties. His answer always was in the negative. The referee says the respondent was "evasive." On her fifth trip to respondent's office, she asked about these specific properties, and whether they were transferred to respondent. He still denied the transfers. Finally, however, he admitted the properties had been sold, although, as still he persisted, not to himself, but to McNaul. A certified public accountant who accompanied petitioner to respondent's office on this occasion, interjected to the effect that the records in the recorder's office show that McNaul had conveyed the properties to respondent's corporation. Then, and not before, respondent admitted what he had done, and said he would deed the properties back. In a disciplinary proceeding, as we have held, restitution by the attorney after investigation by his client does not expiate the wrong. *People ex rel. v. Furman,* 72 Colo. 549, 212 Pac. 825. The like doctrine was announced in *People ex rel. v. Hillyer,* 88 Colo. 428, 297 Pac. 1004. The referee seemed to think that since the deeds had been recorded, that fact constituted notice to petitioner that "Mr. Deni-

ous had in reality become the purchaser." The implications of the foregoing are contrary to my understanding of the obligation of an attorney to his client. A client is not supposed to anticipate that his attorney will secretly effectuate conveyance of the client's property to himself, nor is it the rule that the client's security in relation thereto, is dependent on the exercise of constant vigil at the recorder's office. I regard respondent's guilt on this charge as fully established. That respondent was guilty of grave improprieties in the matter thereof, appears from the court's opinion, and that he was actuated by an "improper motive," is emphasized in the dissenting opinion of Mr. Chief Justice Burke and Mr. Justice Alter, with whom I am in agreement.

The court thinks that a "reprimand" recited in the opinion meets the demands of justice, while the Chief Justice and Mr. Justice Alter, premising their appraisal on respondent's actions in the real estate matter and the two Tivoli-Union stock deals, "feel that a penalty reasonably commensurate with our view of the gravity of those transactions should be imposed." I think disbarment should be our pronouncement. From the very beginning of his representation of petitioner, as the record clearly and unmistakably shows, respondent, proceeding in his own interest, and working to a plan, sought the undoing of his client, and over the period of his retention, as further abundantly appears, he succeeded in his purpose to the extent, directly, of an imposing aggregate sum, and, potentially, of an unassessable sum. The language of Judge Brewer (subsequently a Justice of the Supreme Court of the United States) when he sat at circuit, in *United States v. Costen*, 38 Fed. 24 (a disciplinary proceeding), not only is peculiarly applicable here, as I conceive, but heretofore has been approved by us in *People ex rel. v. Cary*, 80 Colo. 443, 251 Pac. 597, a disbarment case. Judge Brewer said: "It is the glory of our profession that its fidelity to its client can be depended on; * * * I can tolerate a great many things

410

that a lawyer may do,—things that in and of themselves may perhaps be criticized or condemned when done in obedience to the interest or supposed interest of his own client, and when he is seeking simply to protect and uphold those interests. If he goes beyond, perhaps, the limits of propriety, I can tolerate and pass that by; but," as emphasized by Judge Brewer, "I cannot tolerate for a moment, neither can the profession, neither can the community, any disloyalty on the part of a lawyer to his client. In all things he must be true to that trust, or, failing it, must leave the profession."